Raymond DENNIS, Irving Dichter, James Durkin, Chase J. Powers, Harold Sanderson, Albert Skinner, Maurice E. Travis, Jesse R. Van Camp, Charles H. Wilson, Appellants,

v.

UNITED STATES of America, Appellee.

Nos. 6451–6459, 6474–6482.

United States Court of Appeals Tenth Circuit.

March 5, 1962.

Rehearing Denied April 11, 1962.

Telford Taylor, of Taylor, Scoll, Ferencz & Simon, New York City (Nathan Witt, New York City, and George J. Francis, Denver, Colo., on brief), for appellants.

George B. Searls, Washington, D. C. (J. Walter Yeagley, Washington, D. C., Lawrence M. Henry, Denver, Colo., Robert L. Keuch and Carol Mary Brennan,

Washington, D. C., on brief), for appellee.

Before MURRAH, Chief Judge, and PICKETT and HILL, Circuit Judges.

MURRAH, Chief Judge.

These appeals are from judgments convicting the nine appellants of conspiracy to defraud the United States (18 U.S.C.A. § 371). The indictment charges, in essence, that appellants, together with five other defendants not involved in this appeal, and others unknown to the Grand Jury, conspired to fraudulently effectuate, on behalf of International Union of Mine, Mill and Smelter Workers, a compliance with Section 9(h) of the Labor Management Relations Act of 1947 (sometimes hereinafter referred to as the Taft-Hartley Act)[1] by means of filing false non-Communist affidavits and to thereby obtain and use the facilities and services of the National Labor Relations Board (sometimes hereinafter referred to as N.L.R.B., or Board).

Appellants were all officers or employees of the International Union of Mine, Mill and Smelter Workers (sometimes hereinafter referred to as Mine-Mill, or Union) within the period beginning in 1949 and ending in 1956, during which the alleged conspiracy existed.

It is here urged that the indictment does not state an offense; that motions for the production of grand jury testimony and statements under Section 3500, Title 18 U.S.C.A. and motions for severance, change of venue, continuance and for a new trial were improperly denied; that the evidence is insufficient to support the judgments as to any of appellants; that the trial court erred in the admission and exclusion of evidence;

and that the summation by the prosecution and the court's charge to the jury were prejudicially erroneous. Appellants also preserve issues concerning the constitutionality of the general conspiracy statute (18 U.S.C.A. § 371), the non-Communist clause of the National Labor Relations Act of 1947 (29 U.S.C.A. § 159 (h)), and Section 3500, solely for further review in the Supreme Court.

■ In a comprehensive opinion, the trial court analyzed and sustained the sufficiency of the indictment here under attack. United States v. Pezzati, D.C., 160 F.Supp. 787. We are in full agreement with the reasoning and conclusion contained in that opinion and, for the reasons there stated, hold that the indictment charged an offense against the United States.

■ Appellant-Travis moved for severance, continuance, and change of venue on the ground that his recent convictions in the same court for the substantive offense of filing false non-Communist affidavits, with extensive attendant publicity, precluded a fair trial. The remaining appellants each moved for severance on the ground that they suffered prejudice by being jointly tried with Travis. Appellants acknowledge, of course, that such relief is largely within the discretion of the trial court, and that its ruling will not be disturbed in the absence of clear abuse. And see Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101.

■■ These motions bring into focus the basic right to a fair and impartial trial, and we proceed on the premise that this right transcends any right to prejudicially publicize or sensationalize its collateral aspects. And, it is no answer

---

1. This Section (29 U.S.C.A. § 159(h), now repealed) provided, in substance, that the Labor Board should not make any investigation concerning the representation of employees requested by a labor organization unless there was on file with the Board "an affidavit executed contemporaneously or within the preceding twelve-month period by each officer of such labor organization and the officers

of any national or international labor organization of which it is an affiliate or constituent unit that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods."

8

to say that an unfair trial is the only one obtainable under the circumstances. See Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250; Irvin v. Doud, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751. But the mere fact of unfavorable publicity does not of itself raise a presumption of prejudice. See Blumfield v. United States (8 C.A.), 284 F.2d 46, cert. den. 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692. The prejudice must have manifested itself so as to corrupt due process.

■ In ruling on Travis' pre-trial motions for severance and continuance on the grounds of prejudicial publicity, the trial court indicated that the proper remedy was change of venue, and invited such motion. The record indicates that such motion did not come until after the jury was empanelled and the question of jeopardy was apparent. Moreover, there was no showing that the unfavorable publicity so saturated the community-mind as to render a fair trial unlikely. Indeed, the record affirmatively shows that only four members of the jury had ever heard of Travis and there was no showing that these four were in any way prejudiced by their knowledge of him.

The motions of the remaining appellants, in addition to the publicity touching Travis' previous trials, also alleged that their joint trial would be prejudicial because certain admissions and other evidence concerning Travis would come before the jury. But, by reason of the very nature of a conspiracy case and the overwhelming evidence as to Travis' status as one of the conspirators, the evidence as to his admissions and activities would have come before the jury regardless of his physical presence. In these circumstances, we do not think the trial court erroneously refused these motions.

The sufficiency of the evidence: without minutely detailing the proof presented by the government, it is sufficient to note that while conflicting, the evidence was such that the jury could, and obviously did, find that appellants, prior to the filing of the affidavits in question,[2] were members of or affiliated with the Communist Party; that such membership or affiliation continued after the filing of the affidavits; and that at least some of the affidavits thus filed were false. Equally sufficient is the proof that the purpose of filing the affidavits was to obtain the services and facilities of the N.L.R.B. and that Mine-Mill did, by means of such affidavits, secure and use those facilities.

■ Appellants are not, however, charged with the substantive offense of filing false affidavits. They are charged with conspiracy to defraud the United States and the conspiracy, or unlawful agreement, is the gist of the offense. Braverman v. United States, 317 U.S. 49, 54, 63 S.Ct. 99, 87 L.Ed. 23; Carlson v. United States (10 C.A.), 249 F.2d 85.

Appellants contend that the evidence is totally lacking with respect to proof that any of them agreed or conspired together, or with any other persons, to accomplish the fraud. As proof of a conspiratorial agreement encompassing all of the appellants, the government undertook to show that aside from their respective positions in Mine-Mill, the accused, as members of the Communist Party, concertedly acted in accordance with a contemporaneous Communist Party policy of having its members occupying official Union positions file false affidavits in order to avail their Union of the services of the N.L.R.B.

The government's proof satisfactorily established that in 1947, upon passage of the Taft-Hartley Act, Mine-Mill adopted a policy of noncompliance which continued until July 1949, when its International Executive Board unanimously voted to comply.[3] It was further shown

---

2. There were thirty-eight (38) non-Communist affidavits filed by the six appellants who were officers of Mine-Mill during the critical period.

3. The Executive Board was, apparently, comprised of ten members, including appellants Van Camp, Powers, Travis and Wilson.

that Mine-Mill's policy of noncompliance, extending through 1948 and into 1949, was the same as that of the Communist Party. And, the government introduced four pieces of evidence intended to prove, inter alia, that Mine-Mill's change of policy was the implementation of a like Communist Party policy change:

1. Witness Loutner testified that in 1949 he was a Party functionary, a member of the National Review Commission, head of the New York State Review or Disciplinary Commission, and member of the New York Organizational Commission of the Communist Party and that in June of that year, he attended a meeting of the Organizational Committee in New York where one Sid Stein, whom he identified as an Assistant Secretary of the Party Labor Commission, discussed Party policy and its application relative to compliance or noncompliance with the Taft-Hartley Act. Specifically, Loutner testified that Stein said: "(T)hat our (the Party) position in the light of the situation at that particular moment must be a principle position * * * based on a consideration that we must not resign leadership in * * * the trade union movement and * * * that kind of principle understanding necessitates a change in our technical approach in relation to the Taft-Hartley noncompliance law * * * that the Party in that particular recent period suffered a lot of losses because of various raids, and that it was then the considered judgment of the Party that for the sake of carrying out a principle position there would have to be compliance with the Taft-Hartley law, as far as non-Communist affidavits are concerned * * * that there will be Party leaders in the labor movement * * * who will resign publicly. They will state in their public resignation that that resignation does not necessarily mean that they broke with the ideology or the principles of the Communist Party, but that this resignation is forced upon them in order to maintain and stay with their membership and give leadership and guidance to them. * * * Ways and means will be found to main-tain contact and liaison with the Party leadership. * * *"

2. Witness Mason testified that he was a member of the Board of Mine-Mill in 1941–1942 and from 1945 to 1953, inclusive, and that in the summer of 1949, at least a month before the July meeting of the Executive Board of Mine-Mill, he had a conversation with appellant-Travis in which "Travis said that quite a number of people out in the field were in favor of the Union changing its position on the Taft-Hartley law, that difficulties of organizing and retaining * * * our membership as a union that is not complying with the Taft-Hartley law and therefore unable to use the machinery provided by the National Labor Relations Board, these difficulties were increasing and that there was discussion going on within the Party concerning the change in this position and (speaking to Mason) 'You'll be happy to learn that the boys in the Party are considering changing our position on this and you'll be hearing about it pretty soon.'" Mason further testified that about a week after the meeting of the Executive Board in which the decision to comply was made, he asked Travis how that decision would affect Travis' position as Secretary-Treasurer of the Union and that Travis replied that he would not have to resign as Secretary-Treasurer "* * * but that he will now have to resign from the Party." Mason stated that Travis showed him a written statement of resignation from the Party and told him that it was "cleared with Ben Gold and the Party people in New York * * *."

3. Witness Fikes testified that he was a member of the Communist Party in 1949, and that during the summer of that year he attended a meeting at which appellant-Wilson said "* * * he had just attended a meeting at the national office and also a party meeting, and that the decision had been made to comply" and that "the officers would fill out the letter of resignation to the party, but that it wouldn't mean anything, that it would be a phoney letter and that it, in his opinion, was a correct decision."

4. Witness Gardner testified that in 1951, when he was a Communist Party member working in the office of appellant-Dennis in Cleveland, Ohio, that he had access to the files of that office and that he found therein the letter of resignation from the Communist Party filed by Dennis and that "I asked him whether he thought it was advisable to leave such a letter as that in the Union files and he assured me that he could see nothing wrong with it because we certainly understood that these letters were sent out, by all of the Party leaders at the time of the signing of the Taft-Hartley affidavits and that there was nothing wrong with it being there, it was simply a record to avoid prosecution under the Taft-Hartley Act * * *."

■ Appellants vigorously attack the competency of Loutner's testimony, which, unlike the testimony of Mason, Fikes and Gardner,[4] was introduced against appellants collectively. Loutner was not named in the indictment as an alleged co-conspirator, nor was he shown to have had any connection with such conspiracy. The statements which he attributed to Stein were not made in the presence of any of the appellants and, having been introduced to prove the fact of a Party policy change (i. e. proof of the matter asserted) they were clearly hearsay. And, unless they came within some exception to the hearsay rule, they were inadmissible. Hopt v. Utah, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262; Donnelly v. United States, 228 U.S. 243, 273, 33 S.Ct. 449, 57 L.Ed. 820; Baltimore American Ins. Co. v. Pecos Mercantile Co. (10 C.A.), 122 F.2d 143, 145, 146; Flintkote Co. v. Lysfjord (9 C.A.), 246 F.2d 368, 385, cert. den. 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46.

■ At trial, the government took the position that Stein's statements were admissible as those of a co-conspirator. However, before the statements of an alleged co-conspirator may be received

in evidence as an exception to the hearsay rule, it is necessary that there be some competent proof, aliunde, from which the jury could conclude that the speaker was a member of the conspiracy. Glasser v. United States, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680; Clune v. United States, 159 U.S. 590, 593, 16 S. Ct. 125, 40 L.Ed. 269; Panci v. United States (5 C.A.), 256 F.2d 308; Kamanosuke Yuge v. United States (9 C.A.), 127 F.2d 683, 689. We find no such evidence. The sole testimony relative to Stein is that given by Loutner.

■ The government contends, however, that there was evidence from which the jury could infer that appellants Travis and Wilson knew who Stein was and that it was therefore permissible for the jury to conclude that Stein was a member of the conspiracy. But even assuming that such was the proof, it fell far short of connecting Stein to the alleged conspiracy—a prerequisite to the competency of his statements. Clearly, the admission of Loutner's testimony as to what Stein said was improper. And though some error in the admission of testimony is almost inevitable in a lengthy trial such as this, we cannot overlook the devastating effect of Stein's statements which blueprinted for the jury the formation of the alleged conspiracy and the means by which it was to be carried out and which were emphasized by the government in both its opening and closing arguments. The admission of this testimony was undoubtedly prejudicial error and requires reversal.

■ But even in the absence of Loutner's testimony, the statements made by appellants Travis and Wilson relative to a change in Party policy; the record proof that appellants, as Party members, subjected themselves to Party discipline; the evidence that a "Steering Committee," of which some of the appellants were members, transmitted "the Communist Party program,

---

4. The conversations testified to by Mason, Fikes and Gardner were admitted into evidence under the court's cautionary instruction for the jury to consider them only as against the declarants.

decisions, to the Union * * *" for implementation; appellants' common knowledge of the problems presented by the Taft-Hartley Act; and the common bonds existing between appellants as members of the Communist Party and as officers and employees of Mine-Mill— furnish competent evidence which, viewed in the light most favorable to the government, authorized the jury's finding that the filing of the false affidavits was the agreed means of perpetuating Communist influence in Mine-Mill, and not a series of unrelated and coincidental acts. Indeed, a conspiratorial agreement is seldom susceptible of direct proof. And, ordinarily, as here, the unlawful agreement can only be established by the acts and conduct of the conspirators and the inferences to be drawn therefrom. Jones v. United States (10 C.A.), 251 F. 2d 288, and cases there cited.

■ Viewed in the light of this evidence, the dismissal of the indictment is inappropriate. And, we thus turn to an examination of the proof allegedly connecting each appellant with the conspiracy. Specifically, appellants Dichter, Durkin, Powers, Sanderson and Van Camp contend that the evidence is lacking in this regard.

Irving Dichter:

Dichter attended a Union Wage Policy Conference in Denver, Colorado in 1948 where he supported the noncompliance policy. Also in 1948, as an International Representative of Mine-Mill, Dichter attended a meeting of the Die Casting Council in Cleveland, Ohio at which Kenneth Eckert (International Executive Board Member representing the Die Casting Division of Mine-Mill) proposed a resolution to change the Union policy from one of noncompliance to compliance. Dichter had learned of the resolution earlier that day and had told Eckert that it "was a sneaky thing to do, that he (Eckert) should have presented the resolution to the staff * * * rather than handed it to the staff a few minutes before the meeting was to take place, and that he (Dichter) was going to call Travis and get him into Cleveland right

away." Appellant Travis arrived in Cleveland the next day and a Communist Party meeting was held. Present at this meeting were Joe Brandt (identified as Labor Secretary of the Communist Party), appellants Travis, Dichter, Dennis and other persons. Brandt stated "that the Union should suspend Eckert from office, cut off his expense accounts and do everything possible to restrict him financially so that he couldn't go out and contact other locals in the surrounding area and * * * Eckert would be publicly expelled from the Communist Party and * * * that as of that time on, we (Party members) were to observe Party discipline and not have any social contacts or discussions with Eckert." Appellant-Travis then stated that he "was going to suspend Eckert from office and he was going to place Irving Dichter in charge of the Cleveland office * * *." Thereafter Dichter took over the Cleveland office and held staff meetings which, at his invitation, Joe Brandt attended. Dichter appeared at an N. L. R. B. election in 1953, and in 1955, upon becoming a Board member of Mine-Mill, he filed a non-Communist affidavit. Shortly thereafter, Dichter conducted an investigation for the Communist Party in order to determine the activities of one of the Party members suspected of leading an anti-Travis movement within the Union. During this investigation, Dichter stated and emphasized that "Mine-Mill was the last stronghold of the Party in the great union movement" and expressed "the importance of holding onto that * * *." In 1956, Dichter filed two more affidavits.

We think this evidence sufficient, in light of the general scheme established by the government's proof, to connect Dichter to the conspiracy.

James Durkin:

Durkin attended a Communist Party meeting in Denver, Colorado in 1948, at which it was decided that Communist officials of the Union would not sign the non-Communist affidavits. In 1952, Durkin, a former President of Office Workers International Union, became an In-

ternational Representative of Mine-Mill. The next year, upon being asked how his affiliation with Mine-Mill had come about, he stated "that after the Office Workers Union had folded up in New York * * * he was then available for an assignment and that the Communist Party in New York had suggested that he could strengthen the leadership of the Party in the trade union movement in the Chicago area, and that they had an opening there in Mine-Mill for him." In 1955, Durkin contacted Fred Gardner, who was the subject of the anti-Travis movement being investigated by appellant-Dichter, and told him that "the party was interested in getting (Gardner's) position * * * and for that reason they were holding a meeting * * and wanted (Gardner) to be sure and be there * * * to explain (his) position again officially for the Party." Durkin attended the meeting.

This evidence, while unquestionably sufficient to show that Durkin was a member of the Communist Party, had no bearing upon the conspiracy to fraudulently obtain the services of the N. L. R. B. The "anti-Travis" movement was a result of Travis' handling of a strike settlement and had no relationship to the filing of false non-Communist affidavits. And even though this evidence was sufficient to support the inference that Durkin had knowledge of the conspiracy, it did not tend to prove that he had in any way become a part thereof. Indeed, he did not file any affidavits and, with the sole exception of attending an N. L. R. B. election in 1955, he performed no acts which might reasonably be said to have been in furtherance of a conspiracy.

 Mere knowledge, approval or acquiescence in the object or purpose of a conspiracy does not make one a conspirator. Cleaver v. United States (10 C.A.), 238 F.2d 766. Accordingly, we hold the evidence to be wholly insufficient to support the conviction of Durkin.

Chase Powers:

In 1948, Powers was a member of the "Steering Committee" which implemented Communist Party policy within the Union. As an International Executive Board member, he attended the 1948 meeting of that Board and advocated the policy of noncompliance. And, in 1949, he was a member of the Board which changed Mine-Mill's policy to one of compliance.

 Power's position on the "Steering Committee" was evidence of his membership in the Communist Party in 1948, but we find no evidence that such membership continued into the period extending from June 1949 to November 1956, during which the conspiracy existed and, a fortiori, no evidence that any of the ten affidavits filed by him during such period were false. The government contends that statements made by Powers during 1953 indicate that he had knowledge that the Communist Party still had influence in the Union. But even so, there was no evidence that he knew that any of the officers of the Union were Communists during the time they were required to file affidavits or that he had any knowledge of any conspiracy to have such officers falsify such affidavits. Without knowledge, the intent to participate in an established conspiracy cannot exist, and " * * * to establish the intent, the evidence of knowledge must be clear, not equivocal." Ingram v. United States, 360 U.S. 672, 680, 79 S.Ct. 1314, 3 L.Ed.2d 1503. For these reasons, Powers' motion for acquittal should have been granted.

Harold Sanderson:

Sanderson was present at the meeting of the "Steering Committee" in 1949 when the 1948 decision of noncompliance on the part of the Communist Party was disclosed. After the International Executive Board of Mine-Mill had decided to change the policy of the Union, Sanderson was named to handle the questions raised by local unions about the filing of the affidavits. In 1953, Sanderson had a conversation with Fred Gardner in which he stated " * * * that there was a very dangerous factional situation within the Party in the Coeur d' Alene (Idaho) area and within the members of the Mine, Mill Smelter

Workers, particularly." That "this factionalism was the result of the resignation of a former International Staff member * * * that I (Gardner) was to be careful on the manner in which I worked in there, to try to remain aloof from these factions until such time as * * * the leadership of the Party * * * felt that it was advisable for me to meet with the Party * * *." And at a party meeting in 1955, attended by appellants Travis, Durkin and Sanderson, it was Sanderson who requested Gardner to state his anti-Travis position for the Party. Additionally, Sanderson notarized the affidavits filed by appellants Travis, Dennis and Powers in 1954.

The evidence is strong that Sanderson was a member of the Communist Party during the conspiratorial period, and the inference that Sanderson, as a member of the "Steering Committee" knew the identity of the others of Mine-Mill's higher echelon who were Party members is entirely reasonable. Certainly his Party associations with Travis, Gardner and Durkin during the critical period support this conclusion. And, his activities in furnishing liaison to the local unions on the problems arising out of the decision to comply with Taft-Hartley and in subsequently notarizing some of the false affidavits are sufficient, in our view, to support the jury's finding that Sanderson was a conspirator.

Jesse Van Camp:

Van Camp attended a Communist Party meeting in East St. Louis, Missouri in 1948, at which appellant-Dennis reported on his recruiting of new Party members. At Mine-Mill's 1949 convention, subsequent to the International Board's decision to comply with Taft-Hartley, and after having filed an affidavit himself, Van Camp told Gardner that "at a Communist Party meeting he agreed to step aside as Board member * * * to permit Raymond Dennis to become the Board member, and at that time he expected to become the Regional Director" of his area. Additionally, Van Camp assisted in N. L. R. B. election campaigns in 1950 and 1952.

This evidence was adequate to establish Van Camp's membership in the Communist Party and the falsity of the affidavit which he filed. And, his nomination of a known Communist to succeed him in a position which he knew, under those circumstances, would require the filing of a false affidavit, supports the jury's finding that he was a knowledgeable participant in the conspiracy.

Without tediously arraigning the proof relating directly to appellants Dennis, Skinner, Travis and Wilson, it is enough to say that their individual acts and declarations were forcefully demonstrative of their culpable association in the conspiracy.

Since, as we have noted, the prejudicial quality of the Loutner testimony requires reversal, it is necessary to treat only those of the remaining allegations of error arising from situations which, upon retrial, are likely to recur. In our view, these situations are confined to the trial court's denial of appellants' motions for the production of grand jury testimony for use on cross-examination and the correctness of certain instructions relating to issues necessarily inherent in the case.

Appellants contend that the trial court's denial of their motions for "in camera" examination of the testimony of various witnesses given before the grand jury were erroneously based upon appellants' failure to disclose inconsistencies. Of course it is now well settled that the traditional secrecy of the proceedings before a grand jury will be broken only upon a showing of a "particularized need." See United States v. Procter & Gamble, 356 U.S. 677, 7 S.Ct. 983, 2 L.Ed.2d 1077; Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323. And, we have recently held that the necessity of demonstrating a "particularized need" extends equally to requests for examinations "in camera." Bary v. United States (10 C.A.), 292 F.2d 53. In our case, appellants moved for the production of grand jury proceedings at the conclu-

sion of the testimony given by the government's first witness. The trial court stated: "The court doesn't feel that the defendant has shown either a particularized need, as the word is used in the Pittsburgh Glass case, or any reason, as a matter of fact, valid or otherwise, why the court should inspect them to determine whether or not there are inconsistencies." The trial court's subsequent rulings on like motions were entirely consistent with the appropriate test of "particularized need" and in view of the availability of the transcripts of testimony relating to the same subject matter given by many of the government witnesses before other tribunals and the voluminous statements of such witnesses produced under 18 U.S.C.A. § 3500, we do not think the trial court abused its discretion in refusing to undertake an "in camera" examination of the grand jury proceedings for the purpose of ferreting out possible inconsistencies.

It is additionally contended that the trial court erroneously refused to instruct the jury as to the significance of membership or affiliation prior to the signing of the non-Communist affidavits, or to instruct that a member could resign from the Party and lawfully sign the affidavit; that the trial court failed to give an instruction explanatory of the bearing which the evidence was to have as to each of the thirty-eight affidavits filed by appellants throughout the conspiratorial period; and that the trial court's instructions adopted the wrong limitational period.

■ At several places in the charge to the jury the trial court quoted the form of the affidavit required by the Taft-Hartley Act. That form states: "I am not a member of the Communist Party or affiliated with such Party * * *." The form of the affidavit, which speaks only in the present tense, together with the jury's knowledge that like affidavits were required to be periodically filed by the same person, made it abundantly clear that its falsity depended upon the affiants' membership or affiliation at the time of filing. And though a specific instruction on the point would have served to eliminate any possible doubt, we cannot say, in view of the entire charge, that the jury was not satisfactorily informed.

■ As to the assertion that the trial court should have singled out and explained the application of the evidence as to each of the affidavits upon which there had been proof, it is patent that such instructions would have been confusing to the jury and would have served only to disproportionately emphasize those particular ingredients of the government's case.

■ The jury was instructed that "(T)he statute of limitations is the period of five years immediately preceding the filing of the indictment * * * on November 16, 1956. Thus, the prosecution must prove * * * that the conspiracy continued and that one of the overt acts alleged in the indictment was committed after November 16, 1951." Appellants say that the 1954 Amendment to 18 U.S.C.A. § 3282,[5] extending the applicable period of limitations from three to five years, should not be construed as being retroactive, and that the period of limitations applicable to this case was three years. But the amendatory Act (68 Stat. 1145) specifically provided that this " * * * amendment * * * shall be effective with respect to offenses (1) committed on or after the date of enactment of this Act, or (2) committed prior to such date, if on such date prosecution therefor is not barred by provisions of law in effect prior to such date." The retroactivity of the amended section is clearly stated and the trial court's instruction thereon was correct.

5. This section, as amended, provides that "(E)xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found * * * within five years next after such offense shall have been committed."

Reversed, with instructions to dismiss the indictment as to appellants Durkin and Powers and to grant a new trial to appellants Dennis, Dichter, Sanderson, Skinner, Travis, Van Camp and Wilson.