UNITED STATES of America, Plaintiff-Appellee,

v.

Craig WARNER, April Covey, Samuel L. Kranzthor, Fred W. Daniels, Jr., Frieda E. Edwards, Frank Daniels and Michael A. Jacobson, Defendants-Appellants.

No. 29505.

United States Court of Appeals, Fifth Circuit.

April 8, 1971.

Rehearing Denied and Rehearing En Banc Denied May 10, 1971.

Lee A. Chagra, El Paso, Tex., for defendants-appellants; Mari W. Privette, Las Cruces, N. M., of counsel.

Seagal V. Wheatley, U. S. Atty., Wayne F. Speck Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, THORNBERRY, and DYER, Circuit Judges.

WISDOM, Circuit Judge:

The defendants-appellants—Samuel L. Kranzthor, Fred W. Daniels, Jr., Frieda E. Edwards, Frank Daniels, Michael A. Jacobson, Craig R. Warner, and April L. Covey—were charged with having conspired knowingly and with intent to defraud the United States to import marihuana into the United States contrary to law, in violation of 21 U.S.C. § 176a.[1] Three other persons were also named in the indictment: Richard C. Semple, III, Michael G. Young, and Rodolfo Vasquez.[2] Semple was never apprehend-

---

[1] § 176a. Smuggling of marihuana; penalties; evidence; definition of marihuana

Notwithstanding any other provision of law, whoever, knowingly, with intent to defraud the United States, imports or brings into the United States marihuana contrary to law, or smuggles or clandestinely introduces into the United States marihuana which should have been invoiced, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such marihuana after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or whoever conspires to do any of the foregoing acts, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000.

[2] The counts of the indictment on which the Government elected to proceed charge the following acts:

FIRST COUNT
(21 U.S.C. § 176a)

That beginning on or about March 2, 1969, and continuously thereafter until on or about March 18, 1969, in the Western District of Texas, and at other places without the jurisdiction of this Court, RICHARD C. SEMPLE III, SAMUEL L. KRANZTHOR, FRED W. DANIELS, JR., FRIEDA E. EDWARDS, FRANK DANIELS, MICHAEL A. JACOBSON, MICHAEL G. YOUNG, CRAIG R. WARNER RODOLFO VASQUEZ and APRIL L. COVEY conspired, confederated and agreed together and with each other and with other persons to the Grand Jury unknown, knowingly and with intent to defraud the United States, to import

ed and remains a fugitive. The other nine defendants pleaded not guilty and stood trial by jury. At the close of all the evidence the district court granted Young's motion for judgment of acquittal. The jury acquitted Vasquez but convicted the other seven defendants.

and bring into the United States marihuana contrary to law, in violation of 21 U.S.C. § 176a, and in furtherance of their said conspiracy and to effect its objects, they performed, among others, the following overt acts:

1. On or about March 2, 1969, SAMUEL L. KRANZTHOR wrote a letter from the Bel Air Motor Lodge, 1811 North Mesa Street, El Paso, Texas, to Rodolfo "Fito" Vasquez, % Delia's Beauty Shop, Fabens, Texas, and marked the letter "personal".

2. On or about March 5, 1969, MICHAEL A. JACOBSON obtained Mexican Tourist Permit No. 952665 and Vehicle Permit No. 066881 covering his 1968 Volkswagen Station Wagon bearing 1969 Arizona License LBH–433 in Nogales, Sonora, Mexico.

3. Prior to March 10, 1969, MICHAEL A. JACOBSON and MICHAEL YOUNG entered Mexico from the United States in MICHAEL A. JACOBSON's 1968 Volkswagen Station Wagon, Arizona license LBH–433.

4. Prior to March 10, 1969, CRAIG R. WARNER and APRIL L. COVEY entered Mexico from the United States in CRAIG R. WARNER's 1959 Volkswagen Station Wagon bearing 1968 Arizona license HSJ–910.

5. Prior to March 15, 1969, FRIEDA E. EDWARDS entered Mexico from the United States in her 1954 Volkswagen sedan bearing 1968 Texas license CLY–80.

6. Prior to March 15, 1969, FRED W. DANIELS, JR. entered Mexico from the United States.

7. From March 13, 1969 through March 15, 1969, CRAIG R. WARNER and APRIL L. COVEY stayed at the Motel Pie de la Sierra, Uruapan, Michoacan, Mexico.

8. On March 18, 1969 at approximately 9:00 a. m., RICHARD C. SEMPLE, III and FRED W. DANIELS, JR., entered the United States from Mexico via the Avenida de las Americas Bridge (Cordova Port of Entry) in a Mexican taxi from Sylvia's Cab Stand in Juarez, Mexico.

9. On March 18, 1969, at approximately 11:30 a. m., FRIEDA E. ED-WARDS left the Las Vegas Motel, Juarez, Mexico, in her 1964 Volkswagen sedan, Texas license CYL–80, carrying a large loaded luggage rack covered with a green tarpaulin and secured with cord.

10. On or about March 18, 1969, at approximately 12:00 noon SAMUEL L. KRANZTHOR landed his Tri-Pacer aircraft, Registry No. N1766A, at the Fabens, Texas, Airport.

11. On March 18, 1969, shortly after noon, Rodolfo Vasquez picked SAMUEL L. KRANZTHOR up at the Fabens Airport and drove to his farm south of Fabens, Texas, in his 1966 Chevrolet Pickup Truck bearing 1968 Texas license 8H–3353.

12. On March 18, 1969, sometime prior to 4:15 p. m., SAMUEL L. KRANZTHOR, RICHARD C. SEMPLE, III, and MICHAEL A. JACOBSON entered the Cafe Monumental in Juarez, Chihuahua, Mexico.

13. On March 18, 1969, at approximately 4:20 p. m., FRANK DANIELS, FRED W. DANIELS, JR., and MICHAEL G. YOUNG, joined MICHAEL A. JACOBSON, SAMUEL L. KRANZTHOR and RICHARD C. SEMPLE, III in the Cafe Monumental in Juarez, Chihuahua, Mexico.

14. On March 18, 1969, at approximately 8:55 p. m., CRAIG R. WARNER and APRIL L. COVEY left the Riviera Motel in CRAIG R. WARNER's 1959 Volkswagen Station Wagon, Arizona license HSJ–910

\* \* \*

### THIRD COUNT
(21 U.S.C. § 176a)

That on or about March 18, 1969, in the Western District of Texas, RICHARD C. SEMPLE, III and SAMUEL L. KRANZTHOR knowingly, with intent to defraud the United States, imported and brought into the United States contrary to law approximately 800 Pounds of Marihuana.

Kranzthor was also convicted of the substantive offense of knowingly importing marihuana into the United States contrary to law.[3] The district court sentenced Kranzthor to serve two concurrent ten-year terms in a federal penitentiary. The court sentenced Frank Dan-

3. Bert Semple was also charged with having knowingly imported marihuana into the United States contrary to law. See footnote 2 *supra*.

iels under the Youth Corrections Act, 18 U.S.C. § 5005 et seq. The remaining five defendants were sentenced to serve six-year terms in a federal penitentiary.

On appeal to this Court four points of error are raised. (1) All of the appellants contend that the district court erred in denying their motions for judgment of acquittal, because the evidence was insufficient to sustain their convictions for conspiracy. (2) Kranzthor contends that the court erred in denying his motion for judgment of acquittal, because the evidence was insufficient to sustain his conviction for the substantive offense. (3) All of the appellants contend that the court erred in admitting the evidence taken from them and their vehicles, because—so they argue—their arrests and the searches of their vehicles were without a warrant or probable cause. (4) The appellants' final contention is that the statute under which they were charged, 21 U.S.C. § 176a, is unconstitutional, because it violates the Fifth Amendment privilege against self-incrimination. We conclude that the judgment of the district court must be affirmed.

## I.

The first two contentions are that the Government's evidence is insufficient to support the defendants' convictions for conspiracy and Kranzthor's conviction for the substantive offense of illegal importation of marijuana.

■ On a motion for judgment of acquittal, the test is whether, taking the view most favorable to the Government, a reasonably-minded jury could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. Sanders v. United States, 5 Cir. 1969, 416 F.2d 194, 196; Jones v. United States, 5 Cir. 1968, 391 F.2d 273, 274; Weaver v. United States, 5 Cir. 1967, 374 F.2d 878, 881. It is true that

much of the evidence in this case is circumstantial, and that at one time some courts expressed the view that in criminal cases based on circumstantial evidence a special rule required the district court to grant the motion for acquittal unless the circumstantial evidence excluded every reasonable hypothesis other than that of guilt.[4] The Supreme Court, however, has said that "[c]ircumstantial evidence * * * is intrinsically no different from testimonial evidence" and that "where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect." Holland v. United States, 1954, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150, 166. The same test, therefore, for judging the sufficiency of the evidence should apply whether the evidence is direct or circumstantial. Indeed, that is the prevailing rule in the federal courts today. See 2 C. Wright, Federal Practice & Procedure, § 467, at 258. To reconcile some older Fifth Circuit cases with the Supreme Court's clear holding in *Holland*, this Court has rephrased the substantial evidence test: in criminal cases based on circumstantial evidence our task is to determine whether reasonable minds could conclude that the evidence is inconsistent with the hypothesis of the accused's innocence. United States v. Andrews, 5 Cir. 1970, 427 F.2d 539, 540; Surrett v. United States, 5 Cir. 1970, 421 F.2d 403, 405. Notwithstanding these differences, which some might term verbalistic, we are in agreement with our brothers in other circuits that whether the evidence be direct or circumstantial, the matter of the defendant's guilt is for the jury to decide unless the court concludes that the jury must necessarily have had a reasonable doubt. See 2 C. Wright, Federal Practice & Procedure, § 467, at 259.

Since there were seven defendants indicted and convicted and since the prin-

4. *See, e. g.*, Riggs v. United States, 5 Cir. 1960, 280 F.2d 949, 955; Cuthbert v. United States, 5 Cir. 1960, 278 F.2d 220, 224–225; 2 C. Wright, Federal Practice & Procedure § 467, at 257–58.

cipal question this case presents is whether as to each one the Government's evidence was sufficient to sustain his conviction, in justice to each, a somewhat lengthy discussion of the Government's case is necessary.

At 9:00 a. m. on March 18, 1969, a Mexican taxicab carrying Fred Daniels and Bert Semple entered the United States at the Cordova Bridge in El Paso, Texas. Because both men appeared nervous and United States Customs inspectors had information that Daniels was suspected of smuggling, the inspectors at El Paso detained Daniels and Semple momentarily and searched them. The search revealed nothing but the inspectors asked the Mexican taxi driver, as they had occasionally done in the past, to report to them after he let off the two men. The driver reported to the inspectors that following the search one of the men had said to him in Spanish, "I thought those inspectors were real smart." The speaker added that it had been useless for the officials to search them since they were not bringing anything back into the country: "What we had, we left in Mexico." The men told the driver that someone might be following them and gave him a tip of four dollars on a ride that cost only four dollars "not to say where I had left them." The inspectors then relayed this information to the Special Agent in charge of Customs in the El Paso area, who in turn alerted the other Special Agents.

About an hour after Fred Daniels and Semple entered the United States, the alerted agents observed Frank Daniels, Fred's brother, and another person driving south toward Mexico in Frank's light blue Volkswagen bus. At 10:30 agents dispatched to Juarez, Mexico, saw Frieda Edwards, sister of Fred and Frank Daniels, accompanied by a passenger, driving her dark blue Volkswagen sedan with a large luggage carrier on top. She was leaving the Las Vegas Motel in Juarez. The carrier appeared to be loaded and was covered with a green tarpaulin. Two men in Frank Daniels's light blue Volkswagen bus were following Frieda's car. Both vehicles stopped at the LaCuesta Restaurant in Juarez. A few minutes later the agents saw Frieda leave the restaurant in her car, but it no longer had the luggage carrier on top. Still without her luggage carrier, Frieda entered the United States at the Santa Fe Street Bridge in El Paso at 1:50 p. m.

The agents attempted to follow Frank Daniels's bus, but soon lost sight of it. At 3:00, however, the Agents spotted it at the Maxfim Restaurant in Juarez. A few minutes later they observed the bus leave the restaurant and drive across the street to the Riviera Motel. There the agents also observed a white-over-beige Volkswagen bus, later determined to belong to Craig Warner and occupied by Warner and April Covey.

At 4:45 Frank Daniels, Fred Daniels, and Michael Young left the Riviera Motel in Frank Daniel's bus and went next door to the Cafe Monumental. They went inside the cafe and seated themselves at a table at which Bert Semple, Sam Kranzthor, and Michael Jacobson were already sitting. As the agents sat outside the cafe, they noticed a 1966 white Chevrolet pickup truck, Texas license number 8H-3353, parked in the parking lot. Soon Frank Daniels walked out of the cafe, looked inside the white pickup truck and then walked away.

Neither Craig Warner nor April Covey actually attended the Cafe Monumental meeting. But their Volkswagen bus was at the adjacent hotel. Moreover, Covey's German Shepherd dog, "Steppenwolf," was at the cafe.

In a short while Steppenwolf came trotting up to the agents. As they were feeding the dog, Jacobson came out of the restaurant, said that the dog "belongs to a friend of mine," and took him inside the cafe.

Within a few more minutes all six men left the cafe. Again, as in the cars, they paired off. Jacobson and Young walked with the dog back to the Riviera Motel. Semple and Kranzthor got in the

white Chevrolet pickup truck and drove off. Fred and Frank Daniels got in Frank's light blue Volkswagen bus and drove back to the Riviera Motel.

At 6:00, just as it was getting dark, the agents observed Frank Daniels's bus leave the motel. Close behind it was Warner's white-over-beige Volkswagen bus and Jacobson's white-over-dark-blue Volkswagen bus. Other than the fact that there were two persons in each bus, the agents could not identify the occupants. The Government argues, however, that it is reasonable to infer that the two occupants of each bus were the same persons who had been seen in them earlier in the day and who turned up in them later that night; in other words, Fred and Frank Daniels were in Frank's bus, April Covey and Warner in Warner's bus, and Young and Jacobson in Jacobson's bus.

The buses left Juarez in a southeasterly direction. They all stopped while one got gasoline. They proceeded in tandem down the Mexican highway toward Tres Jacales until they encountered the white pickup truck coming toward them in the opposite direction. The highway parallels the International Boundary between the United States and Mexico. The truck did not appear to be loaded. At the point of their encounter with the truck, at the village of El Millon, the buses made U-turns and followed the truck up a road into an area of sand hills. The four vehicles parked on a hill above the level of the road for about twenty minutes. The Government argues that it was during this rendezvous that the defendants transferred from the buses to the truck the marihuana later found in the truck on the American side of the border.

When the vehicles finally came back down the hill, the white pickup truck went southeast and the three buses northwest, back toward Juarez. Because it was dark and the agents were some distance from the vehicles, they could not tell whether the truck was then loaded.

In any event, the agents followed the Warner and Jacobson buses back to the Riviera Motel in Juarez. There the agents watched the occupants of the two buses take some things out of their buses, straighten out the inside, and then re-load the vehicles. At 8:50 the Warner and Jacobson buses left the Riviera Motel. The agents attempted to follow them, but lost the Warner bus when it made a U-turn in the middle of traffic. They were able to follow the Jacobson bus to the Cordova bridge, where, after a brief inspection, it entered the United States. At that point the agents could see that the occupants in the bus were two men. Upon crossing the bridge, the Jacobson bus drove to the Papagayo Motel just outside El Paso. There the bus drove into the parking lot and stopped next to a public telephone booth. The Warner bus, which had eluded the agents in Juarez, was already parked at the same spot. The agents maintained surveillance of the two buses until about 10:25. At no time during that interval did the occupants of the two buses (Warner and Covey; Young and Jacobson) ever leave their vehicles; they simply sat there.

At 7:30 agents posted at the Ysleta Bridge saw Frank Daniels's light blue Volkswagen bus cross over into the United States. Although the agents could not see the driver of the bus, they identified the passenger as Fred Daniels. Other agents followed the bus to the home of Frank Daniels's girl friend (so it appears from the record). There the agents observed the bus parked in front of the house and Frank Daniels standing on the porch. By the time the agents had circled the block, the bus was gone. They soon saw it, however, heading northwest toward Frank Daniels's house outside El Paso. When the agents arrived at the Daniels house, they found Frank Daniels's bus parked in the driveway. Sam Kranzthor was standing next to the bus, apparently starting to get in. In the road in front of the house the white pickup truck was parked.

After the rendezvous of the three buses and the white pickup truck in the area of the sand hills, the Special Agent in charge posted lookouts at each of the bridges in the El Paso area. The white pickup truck was last seen in Mexico shortly after 7:00 p. m. as it headed southeast on Mexican Highway 2. It was next seen at 8:55 on the American side of the border going northwest—the opposite direction—on Interstate Highway 10. The Special Agent in charge testified that the truck did not cross at either of the bridges southeast of Juarez, the direction in which it was last seen heading in Mexico. The record indicates, however, that the Rio Grande can be easily forded in that area; indeed, many automobile tire tracks line the dry creek bed. Therefore, the Government argues, it is reasonable to infer that the truck drove south of the last bridges in the El Paso area, crossed the river, made a U-turn, and headed back toward El Paso.

Following the truck as it drove back toward El Paso, the agents noticed that the truck appeared to be heavily loaded. A green tarpaulin covered the objects that were heaped in the back of the truck. As the truck reached El Paso, one of the agents was able to identify Sam Kranzthor as one of the two occupants of the truck. The agents continued to follow the truck as it drove through El Paso north toward Frank Daniels's house.

Agent Kessler was the first agent to arrive at the Daniels house. As noted above, he found Kranzthor standing in the driveway next to Frank Daniels's bus. The white pickup truck was parked in the road in front of the house. As Agent Kessler placed Kranzthor under arrest, someone fired a shot from the vicinity of the truck. Just as the other agents arrived on the scene, the truck backed up and sped away from the house. Four more shots were fired. The agents quickly found the truck a short distance down the road; it had become mired in the sand, and the driver had abandoned it. The door was open

and on the seat was a clear plastic bag containing marihuana. The agents searched the area for the driver of the truck but found no one.

They then looked into the back end of the truck and discovered 800 pounds of marihuana contained in eight burlap bags and a number of suitcases, duffel bags, and footlockers. The burlap bags bore markings indicating that they had been manufactured in Mexico. The suitcases and footlockers were sitting in Frieda Edwards's luggage carrier, which had been placed on top of the burlap bags. The marihuana was packed in the form of bricks; some of the bricks were wrapped in clear plastic bags. The entire load was secured by pieces of synthetic cord and covered with a green tarpaulin. Inside the truck the agents found Bert Semple's driver's license, a letter from Kranzthor to Rodolfo Vasquez, some Mexican matches and cigarette papers, balance scales marked in kilograms, some men's and women's clothing, and a Bible belonging to Fred Daniels.

As soon as Kranzthor was arrested and the truck containing the marihuana seized, the Special Agent in charge instructed his other agents to arrest the suspected conspirators. At 10:25 therefore the agents maintaining surveillance at the Papagayo Motel moved in on the occupants of the Warner and Jacobson buses. Agent Robinson arrested Warner and Covey as they sat in Warner's bus. The agent searched Warner and found pieces of paper on which were written the former address of the Daniels brothers and their telephone number. Inside the Warner bus the agents found some camping equipment and clothing, Steppenwolf, the dog they had fed earlier, marihuana sweepings, a bill for accommodations for two persons from March 13 to March 15 at a motel in Uruapan, Mexico, a bill for repair work done on Warner's bus at Uruapan on March 15, another bill for car repairs at Zacatecas, Mexico, on March 17, an envelope addressed to Warner in care of Frank Daniels at Frank's former resi-

dence in El Paso, and a receipt indicating that in Guadalajara on March 10 Covey exchanged $510 for Mexican pesos.

Agent Morgan arrested Young and Jacobson as they sat in Jacobson's bus. In Jacobson's wallet the agents found cards on which were written the telephone numbers of Frank Daniels and Frieda Edwards. Inside Jacobson's bus the agents found camping equipment and clothing, Mexican tequila, a car repair bill from Uruapan, Mexico, dated March 15, a receipt for the exchange of $800 at Uruapan dated March 10, and a large quantity of empty clear plastic bags identical to those discovered in the back of the white pickup truck.

Following their capture of the white pickup truck, the agents returned to Frank Daniels's house, where they observed Fred Daniels, Frank Daniels, and Frank's girl friend get in Frank's bus and start to drive away. The agents quickly halted the bus and arrested the three occupants. Shortly thereafter, the agents spotted Frieda Edwards sitting in her Volkswagen sedan approximately a block north of Frank Daniels's house. She was arrested and taken to the Daniels house. There the Special Agent in charge administered the prescribed *Miranda* warnings to the four persons in custody. A search of Fred Daniels's clothing revealed marihuana sweepings. In Frank Daniels's jacket the agents found a set of keys that fitted the locks on the footlockers full of marihuana found in the back of the white pickup truck. A search of Frieda Edwards's Volkswagen sedan disclosed some pieces of cord identical to those used to secure the marihuana in the back of the white pickup truck. In Edwards's car the agents also found a car repair bill from Uruapan, Mexico, dated March 15. The bill was issued to a "Sr. Frece Daniels."

Taken together, the car repair bills, motel bill, and money exchange receipts indicate that Warner, Covey, Jacobson, and Fred Daniels were all in Uruapan, Mexico, on March 15. At the trial Government agents testified that marihuana grows in prolific quantities in the area around Uruapan. In March 1969 the price of marihuana there was about ten dollars a pound; the price in the United States at the same time was about ninety or one hundred dollars a pound. On the basis of this evidence the Government argues that the above named appellants drove to Uruapan, purchased the 800 pounds of marihuana, and brought it back to Juarez, where they transferred it on the evening of March 18 to the white pickup truck to be driven across the border.

Later investigation disclosed the fact that the white pickup truck belonged to Rodolfo Vasquez. At the trial Vasquez testified that he lent the truck to Kranzthor on the day before the events here described. The agents also learned that Kranzthor owned a Tripacer single-engine airplane and that he had flown the airplane to various places in Mexico in early March. Searches of Kranzthor's clothing and the floor of the airplane revealed marihuana sweepings.

The appellants argue that the evidence recited here in some detail is insufficient to establish that they conspired to import marihuana into the United States contrary to law and that they committed any overt acts in furtherance of the conspiracy. Kranzthor, who was convicted of the substantive offense of illegal importation, also argues that the Government failed to prove beyond a reasonable doubt that the marihuana was in fact imported and that he imported it. The gist of Kranzthor's argument is that the Government's evidence leaves unaccounted for an hour and forty-five minutes between the time agents in Mexico last saw the white pickup truck and the time agents in the United States first observed the truck on the evening of March 18; during that time period unknown persons could have loaded the marihuana on the truck in the United States. Moreover, the only evidence indicating that Kranzthor imported the marihuana is that he was once seen riding in the loaded truck on the American

side of the border, and as a matter of law his mere presence in the truck is insufficient evidence.

## II.

■ We deal first with the appellants' common contentions. The essential elements of the federal crime of conspiracy, 18 U.S.C. § 371, are an agreement by two or more persons to combine efforts for an illegal purpose and an overt act *by one* in furtherance of the agreement. United States v. Falcone, 1940, 311 U.S. 205, 210, 61 S.Ct. 204, 85 L.Ed. 128, 132; Roberts v. United States, 5 Cir. 1969, 416 F.2d 1216, 1220; Nelson v. United States, 5 Cir. 1969, 415 F.2d 483, 485; Kirschbaum v. United States, 8 Cir. 1969, 407 F.2d 562, 565. Since a conspiracy by its very nature is born and clothed in secrecy, the first element of the offense—agreement—is seldom susceptible of direct proof. Proof of the agreement or common purpose therefore must rest upon inferences drawn from relevant and competent circumstantial evidence—ordinarily, the acts and conduct of the conspirators themselves. United States v. Varelli, 7 Cir. 1969, 407 F.2d 735, 741; Miller v. United States, 9 Cir. 1967, 382 F.2d 583, 586; Rodriquez v. United States, 5 Cir. 1967, 373 F.2d 17, 18; Jordan v. United States, 10 Cir. 1966, 370 F.2d 126, 128; Dennis v. United States, 10 Cir. 1962, 302 F.2d 5, 11. Once the existence of the agreement or common scheme of conspiracy is shown, however, *"slight* evidence" is all that is required to connect a particular defendant with the conspiracy. United States v. Jones, 9 Cir. 1970, 425 F.2d 1048, 1951; United States v. Knight, 9 Cir. 1969, 416 F.2d 1181, 1184; Lopez v. United States, 5 Cir. 1969, 414 F.2d 909, 911. And once it is shown that a particular defendant joined the conspiracy, the acts of his co-conspirators done in furtherance of the conspiracy are attributable to him and he becomes equally liable for them. Grimes v. United States, 5 Cir. 1967, 379 F.2d 791, 795;

Hernandez v. United States, 9 Cir. 1962, 300 F.2d 114, 121.

■ With these principles in mind, we hold that from the evidence presented a reasonably-minded jury could conclude beyond a reasonable doubt that the defendants entered into a common scheme to import marihuana into the United States contrary to law and that the overt acts proved were in furtherance of that scheme.

■ In response to Kranzthor's individual contentions, the Government argues that the evidence is sufficient to allow the jury to conclude beyond a reasonable doubt that the marihuana was in fact imported and that Kranzthor imported it. First, the evidence showed that in early March 1969 at least Warner, Covey, Jacobson, and Fred Daniels drove to Uruapan, Mexico, where marihuana is known to grow abundantly. While still in the interior of Mexico but shortly before returning to the United States, Covey and Jacobson exchanged over $1,300 for Mexican pesos. Inside their vehicles, however, the Customs agents found camping gear and an inexpensive motel bill, which, the Government argues, indicates that the travelers were living frugally. Moreover, the only significant purchase found in any of the vehicles was the 800 pounds of marihuana. That quantity of marihuana would have cost $8,000 in Uruapan, $80,000 in the United States.

Second, there was the evidence of Frieda Edwards's luggage carrier. On the morning of March 18 agents in Mexico had observed Frieda driving her Volkswagen sedan with the luggage carrier on top; the luggage carrier was then loaded, but with what the agents could not tell. While still in Mexico, the luggage carrier disappeared; Frieda crossed the border in the early afternoon without it. The agents next saw the luggage carrier late that night in the back of the white pickup truck. The luggage carrier was then loaded with 230 pounds of marihuana.

Third, the evidence concerning the route taken by the white pickup truck on the evening of March 18 seems inconsistent with the hypothesis of innocence. Agents in Mexico last saw the truck on Mexican Highway 2 heading southeast, away from Juarez. The truck did not pass through either of the ports of entry just southeast of Juarez. The evidence revealed, however, that the Rio Grande in that area is often a dry creek bed, which cars and trucks can easily cross. Agents in the United States spotted the truck approximately one hour and forty-five minutes after it had last been seen in Mexico. At that time it was still southeast of El Paso-Juarez; however, it was then heading northwest, back toward El Paso. In contrast to its appearance earlier in the day, it was then heavily loaded. The agents followed the truck to the Daniels residence north of El Paso where they found 800 pounds of marihuana in the back of the truck. The Government argues that a truck not carrying contraband would not have taken that circuitous route but would have crossed the border at the most convenient point, either the Fabens or Ysleta ports of entry.

Finally, the Government argues that the physical condition of the marihuana and the items seized with the marihuana indicate its foreign origin. Eight hundred pounds is—in this country—a large and expensive quantity of marihuana. Government witnesses testified that they had never seen or heard of a field of marihuana on the American side of the border capable of producing that much marihuana. We have already noted the vastly cheaper price of that much marihuana in Mexico. Most of the marihuana was packed in bricks, a form in which marihuana is frequently smuggled into this country. Some of the marihuana was contained in burlap bags, the markings on which indicate that they had been manufactured in Mexico. The balance scales found in the back of the truck were marked off in kilograms rather than pounds, the analogous American unit.

To establish that Kranzthor had illegally imported the marihuana, the Government proved that on the day before the events in question Kranzthor borrowed the white pickup truck from Rodolfo Vasquez. On March 18 agents in Mexico observed Kranzthor meet with Bert Semple, Jacobson, Young, Fred Daniels, and Frank Daniels at the Cafe Monumental. When the meeting broke up, Kranzthor got in the truck with Semple and drove away. About one hour and forty-five minutes after the truck was last seen in Mexico, agents observed Kranzthor riding in the truck on the American side of the border. The truck was heavily loaded. The agents followed the truck to Frank Daniels's house where they arrested Kranzthor. A search of the truck which Kranzthor had procured and in which he was seen riding revealed 800 pounds of marihuana. When added to the circumstances indicating illegal importation of the marihuana, the Government argues, this evidence is sufficient to allow a jury to conclude beyond a reasonable doubt that Kranzthor imported it.

As we indicated at the outset of this opinion, in a criminal case in which the jury has rendered a verdict of guilty, the appellate court must sustain that verdict if there is substantial evidence, taking the view most favorable to the Government, to support it. See Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680. This means that we must accept as established all reasonable inferences that tend to support the action of the jury, and any conflicts in the evidence must be resolved in favor of the jury verdict. Gordon v. United States, 5 Cir. 1971, 438 F.2d 858; United States v. Francisco, 8 Cir. 1969, 410 F.2d 1283, 1288. We hold therefore that from the evidence presented a reasonably-minded jury could conclude beyond a reasonable doubt that the marihuana in this case was imported and that Kranzthor imported it. In other words, reasonable minds could conclude that the Government's evidence is inconsistent with the hypothesis of Kranzthor's inno-

cence. *See* United States v. Andrews, 5 Cir. 1970, 427 F.2d 539, 540; Surrett v. United States, 5 Cir. 1970, 421 F.2d 403, 405.

## III.

The appellants next contend that the district court should have suppressed all evidence taken from them and their vehicles for the reason that their individual arrests, searches, and the searches of their vehicles were without warrants or probable cause in violation of the Fourth Amendment. It is undisputed that at the time of their arrests and the searches of their vehicles the Customs agents had neither an arrest warrant nor a search warrant. We hold, however, that the evidence taken from them and their vehicles was properly admitted as the fruits of valid border searches.

■■ Recognizing the peculiar and difficult problems involved in effectively policing our extensive national boundaries, Congress has granted Customs officials broad authority to stop and search any person or vehicle suspected of carrying merchandise illegally imported into the United States and to seize any merchandise that the officials have reasonable cause to believe to have been illegally imported. 18 U.S.C. § 482. *See* United States v. Glaziou, 2 Cir. 1968, 402 F.2d 8, 12; Thomas v. United States, 5 Cir. 1967, 372 F.2d 252, 254; King v. United States, 9 Cir. 1965, 348 F.2d 814, 816–818. Federal courts have unanimously interpreted this Congressional grant to mean that Customs agents may stop a person and conduct a "border search" without first procuring a search warrant or even having probable cause to believe that the person has committed a crime. In the parlance of these decisions, the agents' "mere suspicion" of possible illegal activity is enough cause to justify a border search. *E. g.*, United States v. Hill, 5 Cir. 1970, 430 F.2d 129, 130–131; United States v. Glaziou, *supra*; Morales v. United States, 5 Cir. 1967, 378 F.2d 187, 189; Alexander v. United States, 9 Cir. 1966,

362 F.2d 379, 382. Border searches are of course not exempt from the Fourth Amendment requirement that searches and seizures be reasonable. United States v. Glaziou, *supra*; United States v. McGlone, 4 Cir. 1968, 394 F.2d 75, 77; Marsh v. United States, 5 Cir. 1965, 344 F.2d 317, 324. *See also* Note, Border Searches and the Fourth Amendment, 77 Yale L.J. 1007 (1968); ALI, A Model Code of Pre-Arraignment Procedure § SS 6.02 (Tent. Draft No. 3, April 24, 1970). Yet what is reasonable within the meaning of the Fourth Amendment must depend upon the facts and circumstances of the particular case. Cooper v. California, 1967, 386 U.S. 58, 59, 87 S. Ct. 788, 790, 17 L.Ed.2d 730; United States v. Glaziou, *supra*; United States v. McGlone, *supra*. And a border search is not unreasonable simply because it is made without probable cause. Marsh v. United States, *supra*. Indeed, many searches that would be unreasonable if conducted by police officers in the ordinary case are nevertheless reasonable if conducted by Customs agents in lawful pursuit of illegal imports. *See* Thomas v. United States, *supra*; Alexander v. United States, *supra*.

■ Not only is the Customs agents' right to conduct a border search broad, but also the term "border" is itself elastic. United States v. Glaziou, *supra*; Marsh v. United States, *supra*. The "border" includes not only the actual border crossing points but also a reasonable extended geographic area in the immediate vicinity of the crossing point. United States v. Glaziou, *supra*. The "right to arrest by Customs' agents doesn't cease simply because the suspect may get his foot across on this side of bridge * * * it extends to the immediate area." Marsh v. United States, *supra*. Moreover, simply because Customs agents inspected a person or his vehicle at the crossing point does not mean that they may not conduct a second border search within the immediate vicinity of the crossing point: a person is not immune from further examination by Customs agents "merely because he

'may momentarily escape detection and pass safely through the first Custom's check.'" Thomas v. United States, *supra*; *see also* Morales v. United States, *supra*. On the other hand, the Supreme Court long ago recognized that once a traveler's entry into the country becomes complete, he is entitled to the complete protection of the Fourth Amendment:

those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.

Carroll v. United States, 1925, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543; *see also* Thomas v. United States, *supra*; Marsh v. United States, *supra*. Therefore when Customs agents choose to conduct a border search outside the immediate vicinity of a border crossing point, the legality of the search will usually depend upon such factors as the distance of the search from the crossing point, the time elapsed since crossing, and the circumstances upon which the agents base their suspicions. McGlone v. United States, *supra*; Alexander v. United States, *supra*; Marsh v. United States, *supra*.

■ We have already recited in some detail the surveillance activities of the El Paso area Customs agents on March 18, 1969. From this evidence we conclude that by late that evening the agents had reasonable cause to suspect that the appellants, their vehicles, and the white pickup truck might be in possession of merchandise that had been imported into the United States contrary to law. A border search was clearly in order. We further hold that the agents acted reasonably in following the appellants in their vehicles to their respective destinations in the El Paso area and there searching their persons and their vehicles for contraband. It necessarily follows then that the district court did not err in denying the appellants' motion to suppress the evidence.

Since we have concluded that the evidence taken from the appellants and their vehicles was properly admitted as the fruits of a valid border search, we need not decide whether the evidence might also be admissible as the products of searches incident to lawful arrests, and we express no opinion on that issue.

## IV.

■ The appellants' final argument is that the statute under which they were charged, 21 U.S.C. § 176a, is unconstitutional for the reason that the declaration and invoicing requirements violate the appellants' Fifth Amendment privilege against self-incrimination.

This Court has recently considered this issue in Walden v. United States, 5 Cir. 1969, 417 F.2d 698. There we held in the face of a similar contention that the declaration and invoicing requirements of the statute were not unconstitutional. The Ninth Circuit has reached the same conclusion. *See* United States v. Avey, 9 Cir. 1970, 428 F.2d 1159, 1160; United States v. Vansant, 9 Cir. 1970, 423 F.2d 620. Moreover, we have reaffirmed our decision in *Walden* on at least four different occasions. *See* United States v. Johnson, 5 Cir. 1971, 885 F.2d 439; United States v. Hudson, 5 Cir. 1970, 431 F.2d 468, 469; United States v. Candanoza, 5 Cir. 1970, 431 F. 2d 421, 423–424; United States v. Houle, 5 Cir. 1970, 428 F.2d 816, 818.

Therefore, for the reasons set out above, we affirm the judgment of the district court.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.