THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM SCHUELE *et al.* Plaintiffs in Error.

*Opinion filed June 22, 1927.*

1. CRIMINAL LAW—*an instruction to disregard false testimony should not single out testimony of defendants.* An instruction as to the credibility of witnesses should not conclude with the statement that except in so far as their testimony is corroborated the jury may disregard the testimony of the defendants if, after considering all the evidence in the case, they find "that the accused have willfully and corruptly testified falsely to any fact material to the issue," as the jury might infer that they could disregard only the false testimony of the defendants and not that of any other witness; and such instruction is especially prejudicial where conviction rests entirely on the testimony of a witness whose credibility is doubtful.

2. SAME—*a lengthy instruction as to reasonable doubt is improper.* It is not proper to give a lengthy instruction on the subject of reasonable doubt as the term needs no definition and instructions elaborating thereon are confusing.

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. T. N. GREEN, Judge, presiding.

GEORGE W. SPRENGER, for plaintiffs in error.

OSCAR E. CARLSTROM, Attorney General, HENRY E. PRATT, State's Attorney, MERRILL F. WEHMHOFF, and JAMES B. SEARCY, (FREDERICK F. BECKMAN, of counsel,) for the People.

Mr. CHIEF JUSTICE HEARD delivered the opinion of the court:

Plaintiffs in error, William Schuele, aged forty-two, and Frank Schuele, aged forty years, were each convicted in the circuit court of Peoria county of the murder of their brother, Edward Schuele, and sentenced to be imprisoned

in the penitentiary for a term of fourteen years. The record is before this court for review upon writ of error.

The mother of plaintiffs in error died August 26, 1926. Prior to her death she resided at 407 Krause avenue, in Peoria, with plaintiff in error William Schuele and his brothers George and Edward. After the mother's death these three brothers continued to reside in the same place until George left on account of some trouble with Edward over a refusal of George to loan money for drinks. William and Edward remained in the home until September 20, when, as the witnesses say, Edward threw William and the witness William Lick out of the house for drunkenness, after which time Edward remained in the home alone and William went to live with Lick at 3215 South Washington street, about a block and a half away. Frank was married and lived with his family at 209 Western avenue, about a quarter of a block from Lick. About 11:30 A. M., October 5, Edward was found on the floor of his bed-room, dead, as the result of a bullet wound. His body was cold and rigid. The doors and windows of the house were locked, and the bullet which killed him was evidently fired through the window by some person on the outside of the house. He was last seen alive, not far from his home, at 8:00 P. M. on October 4. About 9:30 P. M. a neighbor heard a pistol shot, but upon going to the door saw or heard no one. No one saw the crime committed and no witness testified to seeing either William or Frank in the neighborhood of Edward's home at a time when the crime could have been committed. Though questioned repeatedly by the police officers and State's attorney there was no evidence of confessions or admissions of guilt by them.

Plaintiffs in error are only connected with the crime by statements alleged to have been made to the witness Lick, who was arrested with them on the afternoon of October 5, and who, after being detained in jail some days, made an

affidavit for the State's attorney and was then released. He testified that about September 1 he was in his back yard, and as William and Frank were coming up the alley back of his house, and as they were passing his gate, he heard Frank say to William, "The only way we can do is to bump Eddie off." His testimony in that regard is somewhat weakened by the fact that at the coroner's inquest, in detailing this same conversation, he said that Frank said, "We will sell the place and we will fire him out or do something else," and by the further fact that on this trial while on direct examination, in giving the conversation, he used Eddie's name as quoted above, on cross-examination he said, "On the occasion I heard Frank and William in the alley talking about bumping somebody off, they didn't stand there; they just passed the gate; because they came from that way led me to believe they meant Edward and nobody else; if they had come from the other way I wouldn't know who they meant then." Lick also testified that on the evening of October 4 William and Frank were at his home and the three of them were drinking intoxicating liquor until about 9:00 o'clock; that during the course of the evening Frank picked up a revolver belonging to Lick, which was lying on the dresser; that Lick told him to put it down, and he did so; that about one-half hour later, at the request of William, Lick left the house and returned in about ten minutes with another bottle of liquor, which Frank and William drank; that soon thereafter Frank and William left the Lick home, saying that they were going to the house but did not mention whose house; that William returned to the Lick home about 10:30 or 11:00 o'clock that night and Frank went to his home; that about 7:00 o'clock on the morning of October 5 Frank came over to Lick's home and complained of feeling "rotten" and asked if they could get a bottle; that Lick had not been out of his house that morning before that time; that the bottle was procured, and after the three of them, William having got up in the mean-

time, sat there drinking and talking, Frank told Lick "we bumped Eddie off last night;" that Lick then went to his bed-room, and upon looking in the box on his dresser found that his revolver was gone; that he asked Frank what he did with his gun, and Frank replied that they stuck it away, and upon being asked where, Frank replied, "Well, we put it away;" that Lick then said, "This is a nice way, taking my gun and going down there," and Frank said, "Well, we done it;" that the three of them then remained in the Lick home until afternoon, when the police arrived and they were arrested. Lick was held a prisoner about a week after the murder, at which time he returned to his home, and there, together with his sister, Anna Maloney, made a search of the house to find the gun. She found it under the dresser among a lot of underwear, rags and papers, although the police, State's attorney and others had made repeated search of the premises prior thereto, moving the dresser and even taking up the carpets, without finding it. It is also to be noted that Frank, who Lick says told him of the disposition of the gun, did not, according to Lick's testimony, return to the Lick home on the evening of October 4 after 9:00 o'clock. On cross-examination Lick denied that he had testified at the coroner's inquest that William returned at 9:00 o'clock. The stenographer who took his testimony at the inquest testified that he did so testify.

Defendants in error both testified and denied their guilt and denied making any of the statements attributed to them by Lick. They admitted they were at Lick's home on the evening of October 4, but denied seeing a revolver there and having a conversation with reference thereto. They denied that when Frank left for home William left with him. They said they went out to get a bottle about 8:30 and returned together in a very few minutes; that nothing was said about their "going to the house;" that William went to bed at Lick's shortly after 8:30 and that Frank

left alone shortly before 9:00. William testified that he remained in bed at Lick's all night and did not see Frank again until about 11:00 the next day, when Frank came to Lick's. They both testified that they knew nothing of their brother's death until afternoon, when the officers came to arrest them. Frank testified that he arrived at his home shortly before 9:00 P. M. October 4 and went at once to bed and remained there until 11:00 A. M. the next day, when he got up, had breakfast and then went to Lick's. A step-daughter of Frank, who resided at his home, testified that Frank came home at 9:00 o'clock P. M., locked the front door and went to bed, and that she did not see him again after he had retired that night; that she remained there that night, and that when she left for work at 6:30 the next morning he was still in bed. A married step-daughter of Frank testified that she and her husband went to Frank's home about 6:00 o'clock in the morning of October 5, and that as they were going through the alley they saw Lick in the alley coming from the direction of Edward's home toward his own home; that when they arrived at Frank's home he was in bed and remained there until after the husband left, at 6:30. The husband corroborated her in this statement. The married step-daughter further testified that Frank remained at home in bed, asleep, until she called him at 11:00 o'clock, at which time he got up, had some breakfast and then left.

William Lick, the witness to whose testimony it was necessary the jury should give credence to warrant the conviction of plaintiffs in error, was shown by the evidence to be a man of such character that courts and juries would not ordinarily place implicit confidence in his testimony. That the jury did not have such confidence in its truthfulness and that in their deliberations they had some question as to plaintiffs in error's guilt is evidenced by the fact that they fixed the penalty for a cowardly murder at fourteen years in the penitentiary. Under the circumstances of this

case as shown by the record it was highly important that the jury should be accurately instructed as to the law and that the record should be free from prejudicial error. *People v. Reno,* 324 Ill. 484.

The court, after instructing the jury as to the tests to be applied by them in determining the credibility of the several witnesses and the tests to be applied to the testimony of plaintiffs in error, used the following language, in a complete sentence by itself, without applying it to the testimony of witnesses other than the accused: "And the court further instructs the jury that if, after considering all the evidence in the case, they find that the accused have willfully and corruptly testified falsely to any fact material to the issue in this case, they have the right to entirely disregard their testimony, excepting in so far as their testimony is corroborated by other credible evidence or facts and circumstances presented in the evidence in this case." There was a serious question in the case as to whether or not the witness Lick had willfully and corruptly testified falsely to material facts in the case, and from this instruction the jury might infer that while, if plaintiffs in error so willfully and corruptly testified falsely, they might disregard their testimony, they would not have a right, under the same circumstances, to disregard the testimony of Lick. Under the circumstances the instruction was erroneous in singling out the testimony of plaintiffs in error.

At the request of the prosecution the court gave to the jury a lengthy instruction upon the subject of reasonable doubt, which ended with the sentence, "Your oath imposes upon you no obligation to doubt where no doubt would exist if no oath had been administered to you." In *People v. Rogers,* 324 Ill. 224, this court said: "The thirty-third instruction given for the People related to the term 'reasonable doubt' and called attention to a variety of so-called doubts as not being reasonable doubts. Court and counsel will do well to heed the advice of this court in many cases

in which instructions concerning 'reasonable doubt' have been considered. It is a term which needs no definition, and it is erroneous to give instructions resulting in an elaboration of it.—*People* v. *Johnson,* 317 Ill. 430; *People* v. *Andrae,* 295 id. 445."

The judgment of the circuit court of Peoria county is reversed and the cause remanded.

*Reversed and remanded.*