UNITED STATES of America,
Appellee,

v.

Richard William FRANCISCO, Appellant.

UNITED STATES of America,
Appellee,

v.

Melvin LeRoy FRANCISCO, Appellant.

Nos. 19387, 19390.

United States Court of Appeals
Eighth Circuit.

May 13, 1969.

**1284**

Philip John Bloedel, Minneapolis, Minn., for appellant Richard William Francisco.

Jonathan Lebedoff, Minneapolis, Minn., for appellant, Melvin LeRoy Francisco.

J. Earl Cudd, Asst. U. S. Atty., Minneapolis, Minn., for appellee; Patrick J. Foley, U. S. Atty., was with him on the brief.

Before MATTHES, MEHAFFY and LAY, Circuit Judges.

MEHAFFY, Circuit Judge.

Richard William Francisco and Melvin LeRoy Francisco, brothers, were tried to a jury and found guilty under a two-count information charging a violation of 18 U.S.C. § 659, possession of goods (18 snowmobiles) of a value of more than $100.00 stolen from an interstate shipment, and for violation of 18 U.S.C. § 371, a conspiracy to possess the goods stolen from said interstate shipment. We affirm the convictions.

Richard John Grunau was also charged with the commission of these crimes, but Grunau pleaded guilty prior to the trial of this case and did not testify at the trial.

Defendants assign as error (1) that the evidence was insufficient to support the convictions; (2) that the trial court erred in refusing to grant a mistrial after an elderly witness voluntarily mentioned Grunau's guilty plea in a statement which was possibly inaudible to the jury; (3) that the trial court's instructions with regard to circumstantial evidence were erroneous; (4) that the trial court's instructions concerning aiding and abetting and the essential elements of proving the offense of possession of stolen chattels were erroneous and confusing; and (5) that the court improperly instructed the jury with regard to the standards to be applied to the eyewitness identification of a defendant.

It is not disputed that the snowmobiles were part of a shipment from Polaris Industries in Roseau, Minnesota to Anchorage, Alaska, that their value exceeded $100.00, and that they were stolen from a lot at 2669 Territorial Road in St. Paul, Minnesota belonging to the interstate carrier which was transporting them, K & W Trucking Company, the theft being discovered on the morning of October 19, 1967. Sixteen of the snowmobiles, the K & W flatbed trailer on which they were loaded, and a green GMC single-axle tractor which was stolen the same night from a business located about seven blocks from K & W Trucking Company in St. Paul, were found in a secluded area in Lebanon Township, Dakota County, Minnesota, and the 18 here involved were found in a garage located at 4532 Oliver Avenue North in Minneapolis, all of said snowmobiles being identified by serial number as a part of the interstate shipment.

The facts disclosed that at approximately 3:30 a.m. on the morning of October 19, 1967, three men appeared at Driv-Ur-Self Systems, Inc., a Hertz licensee on Nicollet Island near downtown Minneapolis, and rented one black and two yellow vans, 14, 20 and 22 feet long, identifying themselves as Melvin Francisco, Richard Francisco, and R. J. Gru-

nau, and each man signing for one of the trucks. Grunau paid the $85.00 deposit on the trucks, and Melvin Francisco furnished his driver's license for identification to insert on the lease agreements and explained to the rental agent that they wanted to "move this house all in one trip." When the trucks were returned to Hertz about noon on the same day, the 19th, one had been driven 55 miles and the other two had been driven 56 miles. The two yellow trucks had wavy scratches on the sides, and some yellow paint matching the paint on one of the trucks was found on some tree branches near the secluded area in Dakota County where the 16 snowmobiles, the K & W flatbed trailer, and the green GMC single-axle tractor stolen from another company were found.

Numerous witnesses testified that they observed three men unloading crated snowmobiles from one black and two yellow Hertz vans into a garage located at 4532 Oliver Avenue North in Minneapolis about 8:00 o'clock on the morning of October 19. After the men had finished unloading, they covered the windows of the garage and left. Mrs. Cecelia Engstrom, an elderly lady who owned the garage, testified that she had advertised her garage for rent and that on or about October 9, 1967, a man identifying himself as John Grunau, accompanied by two other men, came to her home and rented the garage. At the trial, she was unable to identify any of the men by sight but testified that Grunau had given her his name and telephone number at the time the garage was rented and that she had later called the number and talked with him on the telephone. The Government called as witnesses several employees of Hertz and numerous neighbors of Mrs. Engstrom who described for the jury their recollection of what the three men looked like, and stated whether they thought the men were the Francisco brothers and Grunau. This testimony, which will be more particularly discussed later, was sufficient to convince the jury of defendants' guilt, but defendants contend that it was insufficient as a matter of law and that the question should not have been submitted to the jury, and that even after conviction they were entitled to acquittal because of insufficiency of the evidence.

The defendants did not take the stand and the only witness who testified in their behalf was Orrie W. Thompson who admitted that Melvin Francisco went with Grunau and another man, whom he said he could not see because it was dark, to rent the trucks, but Thompson attempted to provide Melvin with an alibi for the early morning hours of October 19. Thompson's testimony was to the effect that he, Melvin Francisco, and Jack Walker were together on the evening of October 18 and until about 6:30 or 7:00 a.m. on the 19th. He testified that they had a couple of drinks about 7:00 p.m. on October 18, then went to Tex's On & Off Sale, played pool for about an hour and a half, went to the C & D Tap where they stayed about a half hour, then to Howie's Bar and stayed until nearly 1:00 a.m., then to a restaurant where they stayed until about 2:30, and from there went to Jack Walker's place. Grunau and another man whom Thompson could not see in the dark were there and Melvin Francisco left with them, returning in about 35 minutes with three Hertz trucks, Melvin driving a yellow one. Thompson testified that Melvin got out of the truck, leaving Grunau, the other driver and the three trucks there, and went with him and Walker to his (Thompson's) place where they played cards until 6:30 or 7:00, when Melvin and Walker left, saying they were going home. He did not know whether they went home or not but saw Melvin at his home that afternoon. This was the entire testimony which the defense offered, so, for all practical purposes, the Government's evidence stands undisputed.

Defendants' first contention is that the evidence is insufficient to sustain the convictions. We cannot agree. In a

criminal case where there has been a conviction resulting from a jury verdict of guilty, the appellate court must accept as established all reasonable inferences that tend to support the action of the jury, and any conflicts in the evidence are resolved in favor of the jury verdict. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Latham v. United States, 407 F.2d 1, 2 (8th Cir.1969); Hanger v. United States, 398 F.2d 91, 108 (8th Cir.1968); McClard v. United States, 386 F.2d 495 (8th Cir.1967); Koolish v. United States, 340 F.2d 513, 519 (8th Cir.1965), cert. denied, 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965); Smith v. United States, 331 F.2d 265, 278 (8th Cir. 1964), cert. denied, 379 U.S. 824, 85 S.Ct. 49, 13 L.Ed.2d 34 (1964); Koop v. United States, 296 F.2d 53, 54 (8th Cir.1961). In determining the sufficiency of the evidence, we must view it most favorably to sustain a jury verdict. Teel v. United States, 407 F.2d 604 (8th Cir.1969); Moodyes v. United States, 400 F.2d 360, 363 (8th Cir. 1968); Meyer v. United States, 396 F.2d 279, 283 (8th Cir.1968); Burke v. United States, 388 F.2d 286, 288 (8th Cir. 1968); Terlikowski v. United States, 379 F.2d 501, 511 (8th Cir.1967).

Defendants contend that they were convicted on circumstantial evidence only, that there can be no conviction of a crime on circumstantial evidence unless the only possible inference to be derived from it is that of guilt, that there must be evidence which forecloses and makes impossible any other conclusion, and that the court erred in failing to instruct the jury to this effect, citing Maryland & Virginia Milk Producers Ass'n v. United States, 90 U.S.App.D.C. 14, 193 F.2d 907, 917 (D.C. Cir. 1951). This rule is no longer followed. In Holland v. United States, 348 U.S. 121, 139–140, 75 S.Ct. 127, 137–138, 99 L.Ed. 150 (1954), the Supreme Court said:

"The petitioners assail the refusal of the trial judge to instruct that where the Government's evidence is circum-

stantial it must be such as to exclude every reasonable hypothesis other than that of guilt. There is some support for this type of instruction in the lower court decisions, (citing cases) but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect. (Citing cases.)

"Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

The Supreme Court's teachings in *Holland* set at rest any previous conflict within or between the circuits and must be henceforth followed.

Defendants' principal argument concerning the insufficiency of the evidence centers around the testimony of the various witnesses as to the identity of the defendants as being two of the drivers of the Hertz trucks who transported the snowmobiles to the garage and unloaded them. They admit that Melvin Francisco helped lease the trucks but contend that there is no positive proof of the identity of Richard Francisco, even though one of the men represented himself to be Richard Francisco and signed for one of the trucks.

Raymond A. Klennert, who prepared the Hertz lease agreements, positively identified Melvin LeRoy Francisco and Grunau as two of the men who leased the trucks (he had known Melvin before) and pointed out Richard Francisco

as looking familiar but noted that he was dressed up in court which he was not the night the trucks were rented. Later, he said that Richard Francisco looked like the man and he was pretty near positive that he was the man. He testified that Melvin furnished him his driver's license to place the number on the lease agreements for all three trucks, and that Grunau made the initial deposit of $85.00 on them. He further testified that Melvin Francisco signed for truck #404, Richard Francisco signed for truck #562, and R. J. Grunau signed for the third truck.

Charles E. Reinwand positively identified Melvin Francisco and Grunau as being two of the men who returned the trucks and pointed out Richard Francisco as the third man, but said he was not quite sure about him, "the fellow in the blond hair," stating that the reason he was not sure of his identification was that the third fellow who returned the trucks "had darker hair." F.B.I. Agent Donald W. Thompson testified that Richard Francisco's hair was dark brown at the time of his arrest, but lighter at the trial. Jack D. Walker, a friend of the Francisco brothers who was called as a Government witness, first testified that Richard's hair was lighter at the trial—that it must be dyed—but later retracted the statement. He denied that he had made a statement to F.B.I. agents earlier that it used to be jet black and said he was not positive whether he told them it was black or

not. He wound up by saying that it was about the same color as his own hair—brown—and had always been that color, although other witnesses referred to it during the trial as "light" and "blond." Clarence A. Holman, another employee of the trucking company, testified that he saw a resemblance in Richard Francisco, referring to him as "the man in the light hair," but that the man he saw at the trucking company had dark hair.

In view of the testimony of these witnesses that, except for his lighter hair, Richard Francisco looked like one of the men who rented the trucks, and the further testimony that his hair had been lightened since that time, coupled with the fact that one of the men represented himself to be Richard Francisco, which was not disproved, together with the other attending circumstances, we think there was sufficient evidence to sustain a finding that Richard Francisco did, in fact, sign for and return one of the trucks.[1]

■ ■ Defendants contend, however, that even if they did rent the trucks, they were not sufficiently identified as two of the men who delivered the snowmobiles to the garage, and, therefore, it is not shown that they participated in the crime. It is true that the neighbors, in describing the three men who delivered the snowmobiles, did not describe defendants entirely accurately, but neither did all of the witnesses, who each saw the same men, describe them alike. This only points up the fact that it is

---

1. Although the F.B.I.'s handwriting expert testified that he found that Melvin Francisco's signature to the rental agreement was in his own handwriting, he said that he examined two other samples of handwriting (evidently Richard's) and that the results were inconclusive. Richard could have been trying to disguise his handwriting, however. The defense turned this argument around with regard to Melvin Francisco and argued that since he did not try to disguise his handwriting when signing the rental agreement, that is an indication that he did not intend to use the trucks for an illegal purpose. It will be remembered, however, that Melvin furnished his driver's license, which no doubt contained his signature, for use on the rental agreements, and, therefore, he could not afford to sign the agreement differently. Neither did the F.B.I. expert who examined the paint samples which were found on the trees near where part of the stolen snowmobiles were found determine that the paint came from the truck which Richard signed for, #562, but identified the paint as coming from the truck which Melvin signed for, #404. This does not rule out the probability, however, that both trucks were being used for the same purpose.

the rule, rather than the exception, that people do not generally observe closely enough to be positive of all the various characteristics of people whom they only on an occasion see or meet. The testimony as to identification, however, is to be considered as part of all the evidence and it does not have to be positive in order to connect the defendants with the conspiracy and with the crime. If the facts are considered as established that the Francisco brothers and Grunau rented the trucks at 3:30 on the morning of October 19; that Melvin, in the presence of the others, made the statement that they wanted [to use them] to move a house in one trip, which was not substantiated by the evidence, but to the contrary, the evidence showed that at least one of them was at the location where the two stolen trailers and part of the stolen snowmobiles were found; that one black and two yellow Hertz vans were used to deliver 18 of the stolen snowmobiles to the garage rented by Grunau and that according to some of the witnesses, the drivers of the trucks looked like the Francisco brothers and Grunau or fit generally their descriptions (although they were not absolutely positive); that this was at 8:00 a.m. before the vans were returned at noon; that a test run of the distance between the Hertz rental company, the place the snowmobiles were stolen, the secluded area where part of them were found, the garage belonging to Mrs. Engstrom, and back to the Hertz company was 46 miles and that they had each been driven 55 or 56 miles, this is ample justification for drawing the inference that a conspiracy was formed to rent the trucks and use them to transport the stolen snowmobiles to their places of hiding and that the defendants (or someone working for them) delivered the 18 snowmobiles to the garage.

Since in a criminal case where there has been a conviction resulting from a jury verdict of guilty, the appellate court must accept as established all reasonable inferences that tend to support the action of the jury and any conflicts in the evidence must be resolved in favor of the jury verdict, the evidence here must be held to be sufficient. See Caton v. United States, 407 F.2d 367 (8th Cir.1969); Pigman v. United States, 407 F.2d 237 (8th Cir.1969); Cave v. United States, 390 F.2d 58, 69 (8th Cir.1968), cert. denied, 392 U.S. 906, 88 S.Ct. 2059, 20 L.Ed.2d 1365 (1968); Coon v. United States, 360 F.2d 550, 552 (8th Cir.1966), cert. denied, 385 U.S. 873, 87 S.Ct. 145, 17 L.Ed.2d 100 (1966); and cases cited, supra.

■■ A particular defendant charged with conspiracy need not commit any specific alleged overt act as long as one of his coconspirators was involved in an overt act, and in order to be guilty of conspiracy one need only knowingly contribute his efforts in furtherance of the conspiracy. Nassif v. United States, 370 F.2d 147, 151 (8th Cir.1966); Phelps v. United States, 160 F.2d 858, 867–868 (8th Cir.1947). See also United States v. Dardi, 330 F.2d 316, 327 (2nd Cir. 1964); Hernandez v. United States, 300 F.2d 114, 121–122 (9th Cir.1962). The question of defendants' intent when they rented the trucks and the sufficiency of the evidence were questions for the jury. Coleman v. United States, 378 F.2d 56 (9th Cir.1967).

■ Defendants contend that a mistrial should have been declared when Mrs. Cecelia Engstrom stated that Grunau had pleaded guilty. This may have been inaudible to the jury, but, if not, the most that can be said is that it was harmless error since the evidence clearly showed that Grunau rented the trucks and the garage and that he was unquestionably guilty. It was the obvious intention of all concerned that if possible the fact that Grunau had earlier pleaded guilty would not be disclosed at the trial. Despite the extreme care taken by all of the attorneys, this elderly witness did unsolicitedly make a statement to the effect that Grunau had pleaded guilty. At the time she was apparently speaking to the judge and in such a low

voice that she could not be heard even by all the attorneys. The judge in his wisdom immediately said, "now—just go on now. Answer the next question." At a later point in that day's trial, Judge Lord called counsel to the bench to discuss the occurrence and asked the attorneys if they had heard the remark. Mr. Bloedel, attorney for Richard Francisco, said that he did not hear the statement. However, the district attorney and Mr. Lebedoff heard it, Mr. Lebedoff stating, "well, I heard her say that Grunau was convicted or entered a guilty plea or something of that sort." He did say that his reason for not at least considering the possibility of moving at that time for a mistrial was that there was some question in his mind as to how much of that statement had been heard and he did not want to call the jury's attention further to it. He also said that he had every intention of discussing it with the court out of the jury's presence. When this was discussed with the court out of the presence of the jury, the court offered to give an instruction on it with whatever suggestions defense counsel might have. He was given ample time to confer with the other defense counsel and he candidly told the court that defense counsel had concluded that, if the motion for mistrial was overruled, they would prefer that no further reference be made to the jury by anyone relative to this matter.[2]

■ Thus, the defense could have had a cautionary instruction which would have cured any error, but rather chose not to call the jury's attention to the matter and thereby waived any right to complain. The opinion of the late Judge Sanborn in Wood v. United States, 279 F.2d 359, 363 (8th Cir.1960), is directly in point. See also Koolish v. United States, *supra* at 529–531, and cases therein cited.

■ All of the other contentions relate either to the giving of allegedly erroneous instructions or the failure to give requested instructions. The principal complaint is the assertion of error by the court in refusing to give a specific cautionary instruction concerning identification testimony. A similar instruction was refused by the trial court in the recent case of Cullen v. United States, 408 F.2d 1178 (8th Cir.1969), and in holding that it was properly refused Judge Bright articulated the proper basis for the trial court's refusal to give such an instruction in the following language:

"This instruction was properly refused. The trial court fairly instructed the jury as to the government's burden of proof and the facts to be considered by them before rendering a verdict. This proposed instruction is redundant in substance when considered in the context of the other instructions, fails to correctly state the law and is argumentative. (Citing cases.)"

■ Defendants also argue that the court erroneously instructed the jury on aiding and abetting since they were not specifically charged with this crime. This court has held to the contrary. The giving of an instruction on aiding and abetting does not require reversal,

---

2. "It is my purpose now, for the purposes of the record, to move for a mistrial.

"In the event that the motion is not granted, Mr. Bloedel and I are in agreement that we do not wish this matter further called to the jury's attention. I feel that at least some members of the jury definitely heard the statement; at the least, they heard Mr. Grunau's name mentioned by her. Mr. Faricy has graciously admitted that he heard the statement. I certainly heard the statement. Judge Lord has specifically told us, Mr. Bloedel and myself, that he would co-operate with us in any way relative to any instructions we wanted given to the jury on this matter, and would question the jury as to whether they had heard the statement. I appreciate that offer, but it is the opinion of Mr. Bloedel and myself that any further calling of attention of this matter to the jury would further compound the difficulty. So, if the Court is disposed to deny the motion for a mistrial, we would hope that no further reference is made to the jury by anyone relative to this matter."

although the indictment (or information) failed to charge defendant with this crime, since an aider and abettor may be indicted directly with the commission of the substantive crime and the charge may be supported by the proof that he only aided and abetted in its commission. Latham v. United States, *supra* (407 F.2d at page 4); Theriault v. United States, 401 F.2d 79, 85 (8th Cir. 1968); United States v. Lester, 363 F. 2d 68, 72 (6th Cir.1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1966). 18 U.S.C. § 2 provides that whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal, and that whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

■ Finally, defendants urge that the court erred in failing to instruct the jury that where the Government's case rests on circumstantial evidence, it may be a basis for conviction only if the evidence is completely inconsistent with innocence and excludes every reasonable hypothesis except that of guilt. As pointed out in the discussion on sufficiency of the evidence, this instruction is now considered confusing and incorrect, and the better rule is merely to instruct on the standards for reasonable doubt. Holland v. United States, *supra*.

A careful reading of all the instructions convinces us that they were adequate, accurate and completely protected the defendants' rights. The cases were well and fairly tried, and from the totality of the evidence it was the jury's province to make a determination as to the innocence or guilt of the defendants. Once the determination of guilt has been made based on sufficient evidence, and in a case free from prejudicial error of any sort, we have no right to do anything but sustain the jury's conclusion.

The judgments of conviction are affirmed.