(No. 60258.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LINDA L. CROW, Appellant.

*Opinion filed October 18, 1985.—Rehearing denied December 2, 1985.*

MILLER, J., dissenting.

Randy E. Blue, Deputy Defender, and Dan W. Evers, Assistant Defender, of the Office of the State Appellate Defender, of Mount Vernon, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Jill Wine-Banks and Roma J. Stewart, Solicitors General, and Mark L. Rotert and Terence M. Madsen, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

In a one-count information filed in the circuit court of Randolph County, defendant, Linda L. Crow, was charged with the murder of her husband, Robert Crow. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1).) Following a jury trial defendant was convicted of murder and sentenced to a term of 35 years in the penitentiary. The appellate court affirmed in a Rule 23 order (87 Ill. 2d R. 23; 121 Ill. App. 3d 1164), and we allowed defendant's petition for leave to appeal (94 Ill. 2d R. 315(a)).

Defendant contends that the circuit court erred in refusing to give the second paragraph of an instruction in the form of Illinois Pattern Jury Instructions (IPI), Criminal, No. 3.02 (2d ed. 1981), and that the appellate court erred in holding that the circuit court's ruling did not result in prejudicial error. IPI Criminal 2d No. 3.02 states:

> "Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of [the] [a] defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict.
>
> You should not find the defendant guilty unless the facts or circumstances proved exclude every reasonable theory of innocence."

Citing *People v. Edmondson* (1982), 106 Ill. App. 3d 716, 722, the appellate court held that "failure to give the second paragraph of this instruction [3.02] does not require reversal unless it appears that justice was denied or that the verdict resulted from such error." It concluded that "it does not appear that justice was denied or that the verdict would have differed had the entire instruction been given."

The People contend that the evidence was not entirely circumstantial and that in refusing to give the second paragraph of instruction 3.02, the circuit court did not err. The People contend, too, that for purposes of instructing juries on the standard of proof in criminal cases this court should abolish the distinction between direct and circumstantial evidence and "should abolish the distinction between direct and circumstantial evidence cases for purposes of appellate review." The People argue that defendant's guilt was proved beyond all reasonable doubt and to the exclusion of any reasonable hypothesis of innocence, and that the failure to give the second paragraph of IPI Criminal 2d No. 3.02 was harmless beyond doubt. Because of the nature of the contentions of the parties, a review of the testimony is essential.

The decedent, Robert Crow, defendant's husband, was employed as a police officer with the Sparta police department. He worked the night shift and on December 21, 1981, came home from work shortly after 8 a.m. Soon thereafter, he went to bed. Later that morning, defendant and her three children left the house and drove to a local coffee shop. Defendant and the children returned home at approximately 1:00 p.m., at which time defendant discovered her husband's body under the bed in their upstairs bedroom.

Dr. Steven Neurnberger, a pathologist, testified that the decedent died of a gunshot wound to the back. The

bullet severed the spinal cord and perforated the aorta, causing him to bleed very rapidly and resulting in his death. Once the injury was suffered, the deceased had no further use of his legs. The witness testified that the body's lying face up under the bed with the legs crossed was consistent with his having turned himself over without the use of his legs after the fatal shot was fired and before death occurred. The decedent had also suffered a nonfatal wound to the shoulder. On the basis of an analysis of the stomach contents, the witness placed the time of death at approximately two to two and a half hours after the decedent's ingestion of what might have been a doughnut.

Penny Childs, a dispatcher for the Sparta police department, testified that her entries in the police log showed that on the morning of his death the decedent went to the Circle K Doughnut Shop in Sparta at 7:01 and left there at 7:24. The witness testified that she was a friend of Anita Strattman, with whom the decedent had been involved. After the witness got off duty at about 8 a.m. that morning, she went to the Circle K Doughnut Shop, stayed there for a short time, then proceeded to the city hall, where she paid her water bill, chatted with the city clerk, Ron Cavalier, and Tom Ashley, a policeman, and then returned to the doughnut shop. She testified that as she was sitting down defendant came into the doughnut shop and sat down with her. The witness felt that this was unusual because "she had quit talking to me altogether and hadn't spoke to me within the last two months before that happened."

Joyce Lueth, another dispatcher with the Sparta police department, testified that the log showed that Tom Ashley had gone to city hall at 9:07 a.m. and was out of radio contact until 9:26 a.m. Ashley testified that when he left city hall, Penny Childs and Ron Cavalier were talking.

Donna Taul, a waitress at the Circle K Doughnut Shop, testified that on the morning of December 21 the decedent had come into the shop alone at approximately 7 a.m. or a little later. He drank a cup of coffee and ate a doughnut. She stated that defendant had come into the shop "after 9" and she was "pretty sure" but had some difficulty recalling whether Penny Childs was in the doughnut shop sitting at a table when defendant entered.

Charles and Mildred Downen, who are next-door neighbors of the Crows, both testified that the Crows' driveway was easily visible from their trailer. They testified that after the Richard Simmons Show had begun on television on the day in question they saw defendant's children clearing ice from the windows of her car. The Richard Simmons Show had begun at 9 a.m. and ended at 9:30 a.m. Charles Downen described the morning as cold and icy and indicated that he had watched "the first part" of the television program before the Crows' car left. Mildred Downen testified that when the car left it was "closer towards the end of the Richard Simmons Show than the beginning of it."

Charles Kelly, owner of an ambulance service in Sparta, dispatched to the Crows' residence shortly after 1 p.m. that day, testified that defendant had told him she had left the house at "approximately 9, 9:30." He stated that when he arrived at the house and went upstairs to the bedroom he found the decedent lying underneath the bed frame with the box spring lying on his chest.

Anita Strattman, a radio dispatcher with the Sparta police department, testified that she had been involved with the decedent. She stated that she and Robert Crow had been planning to leave Sparta after his divorce from defendant.

David Dotson, an employee of the Sparta police department and a neighbor of the Crows, testified that he

had seen defendant fire handguns at the police firing range and described her as a "[r]easonably good [shot]." At about 1 p.m. on the day the decedent died, the witness, while on duty, was called to the Crows' residence and found defendant at the doorway crying and saying "Bob's been crushed upstairs." Because the entrance to the bedroom was partially blocked by the bed, the witness had entered the room through an adjoining bedroom of one of defendant's daughters. Upon leaving that bedroom he noticed a handgun partially covered by a T-shirt. When he entered the decedent's room, it was in disarray with dresser drawers pulled open but not out. He further testified that based upon his experience as a police officer the bedroom did not look like it had been burglarized because the clothes that were on the floor were folded and appeared to have been "just taken out and laid down on the floor." He stated that there had been an ice storm the previous night but at 1:45 p.m. police were unable to find any footprints in the grass, and the ice on the outside of the doors leading into the basement had not been broken or disturbed.

Tom Ashley testified that, in a burglary, dresser drawers are usually pulled completely out and emptied of their contents. He also testified that the ice on the doors to the basement had not been broken and that no footprints had been found in the ice-covered grass in the area. The back door of the house was locked, and a door leading from the master bedroom to a balcony outside was also locked from the inside. To reach the balcony from the outside, a ladder would have been required. Ashley testified that defendant had told him that she had left for the doughnut shop that morning a little before 9 a.m.

Wayne Young, an officer with the Sparta police department, testified that when he arrived at the house there was a broken window in the door which led from

the dining room on the first floor into the basement and that the basement was dark. The light switch for the basement light was not readily discernible to a stranger because it was "up underneath, almost right on the ceiling." No windows on the exterior of the house had been broken and the windows on the first floor were locked. The witness testified that defendant stated in the first of two statements to the police that when she returned home at approximately 1 p.m. that day she had had to unlock the front door. However, in a second statement, she stated that when she returned home the front door was unlocked. Young also testified that many items of clothing were found on the floor of the master bedroom, most of which were "stacked up. It was not in disarray." He stated that everything on the decedent's dresser "appeared to be very neat. Nothing was moved out of place." Stereos, guns, and jewelry were left undisturbed. In his opinion a burglary had been "staged." He testified that there had been freezing rain that day and that the basement doors did not appear to have been opened, stating, "The ice was still formed around the corner of the doors." The witness was a friend of the decedent and was familiar with the residence. He stated that there were usually two brown pillows on the couch in the living room on the first floor but that day only one was there; the other was found on the bed of the decedent's stepson on the second floor. Another pillow, in a white case with gunshot residue on it, was found on the floor at the foot of the bed in the master bedroom. A gun case was found at the head of the bed in the master bedroom. A hammer was found in the tool box near the stairway to the basement. The hammer was lying at such an angle that it was holding open the lid of the tool box. The other tools and items on the shelves in the basement were neatly arranged. The witness testified that if one traveled at a rate of 10 miles per hour, it took four min-

utes to drive from the Crows' residence to the doughnut shop.

Frank Cooper, a crime-scene technician with the Illinois Department of Law Enforcement, testified that the thin film of ice on the basement doors appeared not to have been broken and that there were cobwebs at the hinges on the inside of the basement doors. The basement doors were not locked. From the observations of the witness concerning the ice on the doors and the cobwebs within, he was of the opinion that no one had entered through those doors that day. A clock found under one of the decedent's legs showed a time of approximately 9:15. The witness had operated the clock for about 10 seconds and determined that it worked. He further testified that glass dust was found on the head of the hammer. He stated that nothing on the first level of the house appeared to have been disturbed.

Andrew Wist, a forensic scientist for the Bureau of Scientific Services, testified that he found fibers on the revolver consistent with those of the pillow whose white pillow case bore gunshot residue, and concluded that some of the fibers found on the revolver could have come from that particular pillow. He testified further that in his opinion two holes in the bedspread and the top sheet were produced by a single shot.

Blair Schultz, employed in the trace evidence section of the laboratory of the Illinois Department of Law Enforcement, testified that the glass taken from the door leading from the dining room to the basement and the glass particles on the head of the hammer had the same refraction index, and that the particles on the hammer could have come from the glass in the basement door.

Krail Lattig, employed by the Illinois Bureau of Scientific Services, testified that he had examined the revolver and found it to be in good operating condition. In his opinion the four spent cartridges recovered from the

scene had been fired from that weapon. He testified that the pattern of the discharge residue on the pillow case was consistent with the pillow's having been wrapped tightly around the gun when it was fired. He stated that if the pillow were so wrapped around the gun, powder residue would not blow back on the person firing the gun.

Troy Lewis, of the Sparta police department, testified that when off duty the decedent carried the revolver identified as the fatal weapon. He testified that he was lifting weights with the decedent in the master bedroom of the Crows' residence the day defendant purchased and brought the revolver home. Wayne Young also testified that defendant purchased the weapon in September 1981.

Numerous witnesses, including the decedent's sister and mother, testified for the People concerning marital difficulties existing between defendant and the decedent prior to decedent's death.

Testifying in her own behalf, defendant stated that on the morning in question school had been cancelled because of inclement weather. She had asked the children if they wanted to accompany her to the doughnut shop, and they indicated that they wished to do so. She went outside and started the car, to allow it to warm. She returned to the house and told the children to get in the car. The children and defendant went outside to scrape the ice off the windows of the car. Defendant went back into the house to get her purse. She retrieved her purse from the kitchen, took a couple of aspirin in the bathroom, and returned to the car. She stated that she left the driveway at 8:50 a.m., recalling it specifically because she heard the time announced on the radio. They stayed at the doughnut shop until about 10:30 a.m. After leaving the doughnut shop, she ran several other errands. When they returned home at approximately 1

p.m., her daughter noticed that there was broken glass in the door leading down to the basement. Defendant went upstairs to tell her husband about the glass and saw his legs protruding from under the bed. She called his name but received no answer. She told her daughter to call the police and an ambulance. She denied any knowledge that her husband and Anita Strattman were having an affair and denied that she and her husband were having marital difficulties. With respect to the testimony of the People's witness, Michelle Lewis, that defendant had told her that they were having marital difficulties, defendant stated that the witness had lied. Defendant stated that she did not know whether the alarm clock which was found under the decedent's leg had been plugged in that day because it was not the one she used. She said that its noise disturbed her husband while he slept. She testified that when her husband slept he usually kept the loaded revolver on the night stand by his bed. She did not know why the brown pillow was on her son's bed. She denied shooting the decedent.

Sherry Schrader, defendant's 16-year-old daughter, testified that while her mother went into the house to get her purse, she had listened to a song playing on the radio in the car and had tried to get another station. She heard no noise from the house while her mother was getting her purse. She indicated that she had told the police that they arrived at the doughnut shop at about 9:30 a.m. On cross-examination the witness admitted that she had told the assistant principal at her school and her pom-pom teacher a few days before decedent's death that he and defendant were getting a divorce. She admitted having told her pom-pom teacher that defendant and decedent were going to "wait until after Christmas so that the two younger children wouldn't be too upset for the holidays."

Richard Schrader, defendant's 12-year-old son, testi-

fied that when he awoke that morning he had been sleeping on a pillow with a white pillow case and that the brown pillow was not on his bed. He knew the outside basement doors were unlocked because about five minutes after they had returned home from shopping that day he had "lifted up the door about a foot." He admitted having told police officers that "at about 8:50 a.m. Mom got Sherry, Kelly [defendant's nine-year-old daughter], and me up and said we were going down to the doughnut shop" and that they had arrived at the doughnut shop at about 9:30 a.m.

David Hume, a local banker, testified that on that morning, as on other business days, he had gone to the Post Office, the bank, and the doughnut shop, arriving there at approximately 8:35 or 8:40 a.m. He stated that Bob Smith had come into the shop 5 to 10 minutes later. Shortly thereafter, Don Holloway arrived. On cross-examination the witness acknowledged that his testimony concerning the time of his arrival at the doughnut shop was based upon his daily habits and that he had not checked a watch or other timepiece while he was in the doughnut shop. He said he could have arrived there a little later that particular morning because of the ice storm, but he did not think he had done so.

James Robert Smith, a local merchant, testified that on the day in question he had arrived at the doughnut shop at approximately 8:50 a.m. and that defendant had arrived there at about 8:55 a.m. On cross-examination the witness acknowledged that he had not checked his watch concerning the time. He had not seen Penny Childs there when defendant had come into the doughnut shop. The witness stated that he usually went to the doughnut shop at 8:30 a.m., but because of the icy conditions he could have gone there a little later that day. On redirect examination he said that he could have arrived at the doughnut shop as late as 9:20 a.m., but did not

think that he had done so.

Don Holloway, an employee of a local store, testified that he had arrived at the doughnut shop on that morning between 8:45 and 9 o'clock and that defendant was there at that time. The witness indicated that he could have arrived there after 9 o'clock, but he did not think it likely he had done so. On cross-examination he said that he had not checked the clock or a watch upon entering the doughnut shop or upon his arrival earlier at the store where he worked. He stated that it was possible he was mistaken concerning the time of his arrival at the doughnut shop, but that it was not possible that his arrival there was as late as 9:26 a.m.

Defendant called various witnesses, including her sister, in an attempt to show the absence of marital difficulties between defendant and the decedent.

We consider first the People's argument that this court should abolish the alleged distinction between the standards of proof applicable in circumstantial evidence and direct evidence cases. We need not consider this argument for the reason that, in our opinion, the evidence is sufficient to sustain a finding that the facts and circumstances proved exclude every reasonable theory of innocence.

The People argue that the evidence was not entirely circumstantial. They argue that the *corpus delicti* consists of two elements: the fact of death and the fact that the death was produced by the criminal agency of some person. It is the People's contention that the testimony of Dr. Neurnberger, that the decedent died from a gunshot wound which was not self-inflicted, was direct evidence of murder; and that this is sufficient direct evidence to obviate the giving of the second paragraph of instruction No. 3.02. They contend further that assuming, *arguendo*, that direct evidence of defendant's connection with the murder is essential to obviate the giving

of the second paragraph of 3.02, such evidence is found in the record. They argue that the testimony established that the murder weapon was purchased by defendant and that evidence, linking defendant with the weapon, constituted direct evidence of guilt. They cite the testimony that defendant had made statements that if she ever caught her husband with another woman she would shoot both him and her. They cite this statement and others attributable to her as evidence of her intent to commit murder. We do not agree that this is direct evidence. We conclude that the evidence in this cause is entirely circumstantial, and further consideration of the propriety of the circuit court's refusal to give the instruction must be on that basis.

We have examined the authorities cited by the People in support of their contention that statements made by the accused are direct evidence which justifies the refusal of the second paragraph of IPI Criminal 2d No. 3.02. (See *People v. Allen* (1984), 124 Ill. App. 3d 710; *People v. Spataro* (1978), 67 Ill. App. 3d 69.) These cases are clearly distinguishable in that in each case the statement attributed to the defendant placed him at the scene of the offense and in some manner involved him in it.

We consider next the People's contention that we should abolish the distinction between direct and circumstantial evidence for purposes of instructing the jury on the standard of proof in a criminal case. In *People v. Evans* (1981), 87 Ill. 2d 77, the court said:

"Circumstantial evidence is the proof of facts or circumstances which gives rise to a reasonable inference of other facts which tend to establish the guilt or innocence of a defendant. When the evidence finding defendant guilty is entirely circumstantial, the facts proved must be consistent with defendant's guilt and inconsistent with any reasonable hypothesis of innocence. (*People v. Rhodes* (1981), 85 Ill. 2d 241, 249; *People v. Garrett* (1975), 62 Ill.

2d 151, 163; *People v. Branion* (1970), 47 Ill. 2d 70, 77; *People v. Lewellen* (1969), 43 Ill. 2d 74, 78; *People v. Benson* (1960), 19 Ill. 2d 50, 61.) In this case the trial court, over objection of Dorris, failed to include the second paragraph of Illinois Pattern Jury Instruction (IPI), Criminal, No. 3.02 (1968), which states:

'You should not find the defendant guilty unless the facts and circumstances proved *exclude* every reasonable theory of innocence.' (Emphasis added.)

This paragraph should be given when the proof of guilt, as to each element of the offense, is circumstantial." (87 Ill. 2d 77, 83.)

An instruction similar in form to IPI Criminal 2d No. 3.02 has been given in circumstantial evidence cases since *Carlton v. People* (1894), 150 Ill. 181, and as held in *Evans,* it continues to be the rule in this jurisdiction that such instruction be given.

The People contend that the Supreme Court of the United States, the courts of appeal for the Federal circuits, and many jurisdictions have, as we are urged to do, held that such an instruction is no longer required. We have examined *Holland v. United States* (1954), 348 U.S. 121, 99 L. Ed. 150, 75 S. Ct. 127, cited by the People, and find that although the Supreme Court said that such an instruction was no longer necessary, its holding presumes that "the jury is properly instructed on the standards for reasonable doubt ***." (348 U.S. 121, 139, 99 L. Ed. 150, 166, 75 S. Ct. 127, 137.) To the extent that the circuits have followed the Supreme Court in *Holland,* they, too, have indicated that instructions concerning appropriate standards for determination of reasonable doubt are presumed. (See *United States v. Warren* (2d Cir. 1972), 453 F.2d 738; *Davis v. United States* (D.C. Cir. 1970), 433 F.2d 1222, 1226, n.5; *United States v. Francisco* (8th Cir. 1969), 410 F.2d 1283; *Taglianetti v. United States* (1st Cir. 1968), 398 F.2d 558.) Similarly, the authorities in other jurisdictions cited by the People

also presume the giving of an instruction defining reasonable doubt. See *Allen v. State* (Alaska 1966), 420 P.2d 465; *State v. Harvill* (1970), 106 Ariz. 386, 476 P.2d 841; *State v. Bush* (1977), 58 Hawaii 340, 569 P.2d 349; *State v. Wilkins* (1974), 215 Kan. 145, 523 P.2d 728; *State v. Gosby* (1975), 85 Wash. 2d 758, 539 P.2d 680; *Blakely v. State* (Wyo. 1975), 542 P.2d 857.

In *People v. Bennett* (1973), 183 Colo. 125, 131 n.1, 515 P.2d 466, 469 n.1, Colorado abolished the distinction between direct and circumstantial evidence and approved giving an instruction in the following language:

> "There are two types of evidence from which a jury may properly find the truth as to the facts of a case. One is direct evidence—such as the testimony of an eyewitness. The other is indirect or circumstantial evidence, that is, the proof of facts or circumstances from which the existence or non-existence of other facts may reasonably be inferred.
>
> As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that, before convicting a defendant, the jury be satisfied of the defendant's guilt beyond a reasonable doubt from all the evidence in the case." (Colorado Jury Instructions, Criminal 4:1.)

It cannot be determined from the opinion, however, whether, when this instruction is given, the court is also required to define the term "reasonable doubt."

Historically, at least as early as *Miller v. People* (1866), 39 Ill. 457, an instruction was given defining reasonable doubt. For many years, however, this court has disapproved the practice (see *People v. Schuele* (1927), 326 Ill. 366; *People v. Rogers* (1926), 324 Ill. 224), and in IPI Criminal 2d No. 2.05 it is recommended that no instruction defining reasonable doubt be given. We are not persuaded that, absent reinstituting the practice of instructing the jury concerning standards for the determination of reasonable doubt, it is appropriate to discon-

tinue the practice of giving an instruction in the form of
IPI Criminal 2d No. 3.02. We are similarly unpersuaded
as to the wisdom of reinstituting the practice of instruct-
ing juries concerning a definition of reasonable doubt.
Our decision does not preclude further consideration of
the question, but we conclude that for the present time
when the evidence in the case is entirely circumstantial
we should continue to instruct juries in the language of
the second paragraph of IPI Criminal 2d No. 3.02.

The People argue that the failure to give the second
paragraph of IPI Criminal 2d No. 3.02 was harmless be-
yond doubt because defendant's guilt was proved beyond
all reasonable doubt and to the exclusion of any reason-
able hypothesis of innocence. From our examination of
the record, we do not agree. We have considered the evi-
dence in its entirety and are not prepared to say that
had the instruction been given the verdict would not
have been different.

For the reasons stated, the judgments of the appel-
late and circuit courts are reversed and the cause is re-
manded to the circuit court of Randolph County for fur-
ther proceedings consistent with this opinion.

*Reversed and remanded.*

JUSTICE MILLER, dissenting:

The State has asked that by our opinion in this case
we abolish any distinction between direct and circum-
stantial evidence for purposes of instructing juries and
reviewing cases on appeal. Because I believe that cir-
cumstantial evidence is not intrinsically different from
direct evidence, I would do so.

Unlike the majority, I would abandon the use of the
"reasonable hypothesis" instruction contained in Illinois
Pattern Jury Instructions (IPI), Criminal, No. 3.02 (2d
ed. 1981). The first paragraph of that instruction ex-
plains what circumstantial evidence is; the second para-

graph contains the charge, "You should not find the defendant guilty unless the facts or circumstances proved exclude every reasonable hypothesis of innocence." The charge has been given when the evidence of guilt was entirely circumstantial (*People v. Evans* (1981), 87 Ill. 2d 77, 83), and the majority would continue that practice.

In *Holland v. United States* (1954), 348 U.S. 121, 99 L. Ed. 150, 75 S. Ct. 127, the United States Supreme Court found no error in the refusal to give an instruction such as the one at issue here. The court said:

> "The petitioners assail the refusal of the trial judge to instruct that where the Government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than that of guilt. There is some support for this type of instruction in the lower court decisions [citations], but the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect [citations].
>
> Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more." 348 U.S. 121, 139-40, 99 L. Ed. 150, 166-67, 75 S. Ct. 127, 137-38.

Although recognizing that many courts no longer give a "reasonable hypothesis" or "negative exclusion" instruction when the evidence of guilt is entirely circumstantial, the majority declines to abandon the second paragraph of IPI Criminal 2d No. 3.02. The majority explains:

"We are not persuaded that, absent reinstituting the practice of instructing the jury concerning standards for the determination of reasonable doubt, it is appropriate to discontinue the practice of giving an instruction in the form of IPI 3.02. We are similarly unpersuaded as to the wisdom of reinstituting the practice of instructing juries concerning a definition of reasonable doubt." (108 Ill. 2d at 536.)

For the reasons indicated, the majority concludes that the "reasonable hypothesis" instruction should continue to be given when the evidence of guilt is entirely circumstantial.

Because no distinction is drawn between the two types of evidence for purposes of determining guilt, I believe that the "reasonable hypothesis" charge should be discarded. There is but one standard of proof in criminal cases, and that requires proof beyond a reasonable doubt of every element of the offense. (*In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068.) The "reasonable hypothesis" charge implies that the two types of evidence are different, and it, therefore, is likely to mislead a jury. One court has observed:

"Rather than aiding jurors in applying the reasonable doubt standard, an additional charge on circumstantial evidence focusing on the 'reasonable hypothesis' theory serves only to distract jurors from examining the proper standard of proof as the primary focus of their deliberations." (*Hankins v. State* (Tex. Crim. App. 1981), 646 S.W.2d 191, 199 (opinion on rehearing).)

The jury's function as trier of fact remains the same regardless of whether the evidence of a defendant's guilt is entirely circumstantial, entirely direct, or a mixture of the two. In each instance the jurors are asked to consider the evidence, to weigh it in the light of their own observations and experiences in life, and to apply the law to the facts as they find them from the evidence. Thus, it makes little sense to instruct a jury that the evi-

dence must exclude every reasonable hypothesis of innocence when, for example, the evidence indicates that stolen goods were discovered in the possession of a person whose fingerprints, otherwise unexplained, were found at the place from which the goods were stolen, but to omit that instruction when the evidence against the defendant is based solely on the testimony of a single eyewitness, whose memory, opportunity to observe, or credibility might be suspect.

Therefore, I conclude that in instructing juries and in reviewing cases on appeal, no distinction should be made between circumstantial evidence and direct evidence. The two stand on the same footing—one is intrinsically no different from the other—and it is misleading to suggest to a jury that circumstantial evidence is in some way inferior to direct, that it is inherently less reliable or probative. That confusion, however, is the real effect of the "reasonable hypothesis" charge contained in IPI Criminal 2d No. 3.02.

In declining to follow *Holland*, the majority mentions that in many of those jurisdictions in which the "reasonable hypothesis" charge is omitted, an instruction is given defining "reasonable doubt." That misapprehends the defect in the charge, however. The "reasonable hypothesis" instruction should be abolished "not because another part of the charge *dispenses* with the need for it, but because it is inherently confusing to a jury by suggesting that a different burden of proof than the reasonable doubt standard applies in circumstantial evidence cases." (*Hankins v. State* (Tex. Crim. App. 1981), 646 S.W.2d 191, 199 n.1 (emphasis in original) (opinion on rehearing).) Accordingly, there is nothing inconsistent in omitting both types of instructions. See *Hankins v. State* (Tex. Crim. App. 1981), 646 S.W.2d 191; *Blakely v. State* (Wyo. 1975), 542 P.2d 857; but see *State v. Lasley* (Mo. 1979), 583 S.W.2d 511.

The majority also suggests that the "reasonable hypothesis" charge may be discarded only if the jury is given an instruction defining "reasonable doubt." That argument proves too much, for it implies that the special instruction serves merely as a substitute for a definition of "reasonable doubt." There is no reason to suppose that if "reasonable doubt" is to be defined, that should be done only when all the evidence of guilt is circumstantial. Thus, if the "reasonable hypothesis" charge must be retained here, then a definition of "reasonable doubt" should be given too in those cases when the charge is not used, a result that the majority disavows.

Notably, the "reasonable hypothesis" charge originated as a definition of reasonable doubt. In *Carlton v. People* (1894), 150 Ill. 181, cited by the majority, the charge was used to define "reasonable doubt"; the court did not endorse the instruction but found no error in giving it. In effect, then, the "reasonable hypothesis" instruction that the majority preserves by its opinion perpetuates an old way of defining "reasonable doubt," a result that the majority seeks to avoid.

A number of State and Federal courts follow the Illinois rule that no definitional instruction should be given. In *United States v. Lawson* (7th Cir. 1974), 507 F.2d 433, 442, the court said, "Because of the very commonness of the words, the straining for making the clear more clear has the trap of producing complexity and consequent confusion." In *United States v. Shaffner* (7th Cir. 1975), 524 F. 2d 1021, 1023, the court said that "any use of an instruction defining reasonable doubt presents a situation equivalent to playing with fire." In *Holland*, in referring to an instruction improperly defining "reasonable doubt," the Supreme Court said, " 'Attempts to define the term "reasonable doubt" do not usually result in making it any clearer to the minds of the jury,' *Miles v. United States*, 103 U.S. 304, 312, and we feel that,

taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury." *Holland v. United States* (1954), 348 U.S. 121, 140, 99 L. Ed. 150, 167, 75 S. Ct. 127, 138.

Because the "reasonable hypothesis" instruction contains the type of definition of reasonable doubt that concerns the majority, and because circumstantial evidence is not inherently different from direct, I would abandon IPI Criminal 2d No. 3.02 and would give instead an instruction that defines both "direct evidence" and "circumstantial evidence" (see, *e.g., People v. Bennett* (Colo. 1973), 515 P.2d 466, 469 n.1). For the same reasons, I would not apply a different standard on review. I agree with the majority that the evidence in the case before us is sufficient to support a finding that the evidence excluded every reasonable hypothesis of innocence, which is the standard now in use. For that reason and because I believe that the "reasonable hypothesis" instruction should be abandoned, I respectfully dissent from the result reached by the majority.